FILED
4/3/17 4:30 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| PAUL H. TITUS, | : | Case No. 10-23668-TPA |
| *Debtor* | : | |
| | : | Chapter 7 |
| ROBERT SHEARER, Trustee for the | : | |
| Bankruptcy estate of Paul H. Titus, | : | Adv. No. 10-2338-TPA |
| *Plaintiff* | : | |
| | : | Related to Doc. Nos. 1, 61, 113 |
| v. | : | |
| | : | |
| PAUL H. TITUS and BONNIE TITUS, | : | |
| *Defendants* | | |

*Appearances:* Neal H. Levin, Esq. for the Plaintiff
Douglas Campbell, Esq, and Kathryn Harrison, Esq. for the Defendants

**MEMORANDUM OPINION**

The year was 1999 and with the imminent approach of a new millennium the nation was preoccupied by the fear that the "Y2K" problem might soon devastate the computer networks people had so come to rely on. *Star Wars Episode 1:The Phantom Menace* was the top grossing movie, followed by *The Sixth Sense*, which included a clever twist ending. On television, the public was watching a game show called *Who Wants to be a Millionaire*, which was so popular it was on three nights a week. Music CDS were still the rage back in 1999 (although a unique innovation called Napster would soon revolutionize the way people acquired music) and a group called the Backstreet Boys set a record for the largest sales in a single week. For the first time that year the Dow Jones Industrial average topped 11,000 and a cartoon character known as Sponge Bob Square Pants made his debut.

Of less national note, also in 1999, the Titus and McConomy ("T&M") law firm of Pittsburgh ceased to exist, vacating the space in Four Gateway Center that it had been leasing from a company called Trizec,[1] and thereby setting in motion a chain of events – spawning numerous lawsuits and bankruptcies the last of which is "concluding" in this Court for the second time. Many children born in 1999 will be graduating from high school in just a few months, starting new chapters in their lives. While the prospect seems unlikely, perhaps with this decision, the page can finally be turned on this matter as well.

The within Opinion sets forth the Court's finding of fact and conclusions of law pursuant to *Fed.R.Bankr.P. 7052* following the remand of the case by the District Court.[2]  *See*, *Titus v. Shearer*, 498 B.R. 508 (W.D. Pa. Sept. 30, 2013). The Parties are well aware of the facts and procedural history in this matter and no purpose would be served by reiterating them again in detail here. Very briefly, however, prior to 1999, Paul H. Titus ("Debtor") was a partner at T&M. After T&M vacated the premises at Four Gateway Center, Trizec obtained a judgment against him personally as well as against numerous other of his partners, arising out of the breach of the lease. An involuntary Chapter 7 petition was then filed against the Debtor on May 20, 2010, by Trizec. The present Adversary Proceeding was commenced on June 3, 2010, when the Debtor filed a Notice of Removal which removed a pending Pennsylvania state court fraudulent transfer action by Trizec

---

[1]    For convenience, the Court refers to the landlord throughout this Opinion simply as "Trizec," even though a number of related, but separate, entities have been involved in various aspects of the case, e.g., TRZ Holdings II, Inc. and TrizecHahn Gateway, LLC.

[2]    The Court's jurisdiction to hear and decide this matter has not been disputed by the Parties. The Court has jurisdiction of this core matter pursuant to *28 U.S.C. §§ 157* and *28 U.S.C. §157(b)(2)(H)*.

against the Debtor and his wife, Bonnie Titus, to this Court. Subsequently, the Trustee was substituted as Plaintiff in the case. The essence of the claims against Mr. and Mrs. Titus ("Defendants") is that they engaged in fraudulent transfers when, following the entry of the lease judgment against him, Mr. Titus had his individual earnings from his work as an attorney at the Schnader Law Firm deposited into a bank account he owned jointly as tenants by the entireties with Mrs. Titus (hereinafter "the Account").

The Hon. Bernard Markovitz conducted a trial in the case on May 25, 2011, and on February 29, 2012, he issued a Memorandum Opinion and Order, Doc. No. 61, that was reported at *In re Titus*, 467 B.R. 592 (Bankr. W.D. Pa. 2012). Judge Markovitz found that the Trustee had failed to prove his case insofar as he alleged an actual intent to defraud, but that he had proved a case based on constructive fraud. He found in favor of the Trustee and against the Tituses, jointly and severally, in the amount of $281,006.18. Following that decision, the Tituses timely filed a *Motion to Alter or Amend judgment Pursuant to Rule 9023 of the Federal Rules of Bankruptcy Procedure* ("Motion to Alter") on March 13, 2012, at Doc. No. 63.

Judge Markovitz retired and the case was transferred to the Undersigned on March 19, 2012, before the *Motion to Alter* was decided. The Undersigned then heard argument on the *Motion to Alter,* relying, with the consent of the Parties, upon the written transcript of the May 25, 2011 trial. The Court then issued a Memorandum Opinion on September 6, 2012, denying the *Motion to Alter. See*, Doc. No. 84, as also reported at *In re Titus*, 479 B.R. 362 (Bankr. W.D. Pa. 2012). The Tituses then filed a notice of appeal and the Trustee followed with a cross notice of appeal.

3

The appeals were heard in the District Court for the Western District of Pennsylvania by Chief Judge Joy Flowers Conti. On September 30, 2013, Chief Judge Conti issued a Memorandum Opinion and Order affirming Judge Markovitz's February 29, 2012 Opinion and Order, vacating it in part, and remanding the case to this Court for further proceedings. *See* Doc. No. 113. To be more specific, the District Court affirmed Judge Markovitz as to the holding he had made about the preclusive effect of a state court decision, the burden of proof he imposed on the Trustee in the case, the burden of production he imposed on the Tituses with respect to deposits into and expenditures out of the Account, the meaning of the terms "transfer" and "transferee" under the *Pennsylvania Uniform Fraudulent Transfer Act*, or "PaUFTA," 12 Pa.C.S.A. §5101, *et. seq.*, and the effect of Mr. Titus' bankruptcy discharge. The District Court also, however, went on to state:

> The court, however, finds that the bankruptcy court erred by imposing the burden of production on the Tituses without notice and an opportunity to present relevant evidence and by limiting the recovery period to the four years before the complaint was filed. The court remands the case to the bankruptcy court for a determination of liability from April 23, 2003 to May 28, 2010, unless the court finds that equitable principles do not permit transfers after April 23, 2007 to be included. On remand the Tituses may produce evidence about the unexplained deposits and expenditures and any other matter permitted by the bankruptcy court.

498 B.R. at 525.

The scope and effect of Chief Judge Conti's Memorandum Opinion and Order is disputed by the Parties, which dispute will be addressed further below. At a minimum, both sides agree that one feature of the remand was to allow the Tituses to present additional evidence as to deposits and withdrawals because the District Court found that they had not been given sufficient notice at the initial trial that they would be expected to produce such evidence.

4

Upon receiving the remand order from the District Court, this Court quickly convened a status conference for the purpose of discussing the procedure to be followed on remand. The Court was originally of the view that after a brief period for discovery and the filing of supplemental pretrial statements by the Parties it would be possible to convene a trial on remand and render a decision in accordance with the mandate from the District Court. Discovery proved to take much longer than the Court expected. Several extensions were requested by the Parties and ultimately granted by the Court after receiving assurances that the Parties were proceeding as expeditiously as possible. The post-remand proceedings were also slowed by a change in counsel for the Trustee and a number of pre-trial motions.

The Court made clear to the Parties, without objection from them, that its approach to conducting the trial was going to be deliberately expansive in terms of the evidence that could be presented by them.[3] That was a deliberate strategy because, as alluded to above, the Parties did not agree on the exact scope of the remand order. By allowing the Parties to introduce such evidence as they saw fit, even if some of that evidence was ultimately determined to be irrelevant by the Court, the thought was that the Parties would thereby be enabled to create the evidentiary record needed to support their respective positions. In the event of a subsequent appeal, and if it is

---

[3]    The Court indicated at a May 17, 2016 pretrial conference that it intended to take a deliberately expansive approach to the introduction of evidence at the trial on remand, a sentiment with which the Trustee readily agreed. *See Audio Transcript of Proceedings* dated May 17, 2016, 11:37:19 to 11:38:27. That was followed by a pretrial order issued on July 25, 2016, at Doc. #246, in which, while denying some motions in limine, the Court reiterated its intent to take an expansive evidentiary approach and noted that this would hopefully eliminate the need for any further remand in the event of another appeal.

determined that this Court erred in its methodology of calculating liability, the existence of this expansive record hopefully would avoid the need for yet another remand.

For all the various reasons noted above, the trial on remand did not begin until August 9, 2016, much later than the Court had originally anticipated. Moreover, the trial on remand proved to be somewhat frustrating to the Court because, despite the lengthy period that had been allowed for discovery, and despite repeated representations by the Parties that they were making good progress on reaching stipulations as to much of the evidence to be presented, the actual presentation of evidence that occurred did not give that impression. As the Court commented at the time, the proceeding had more of a flavor of a discovery deposition about it than a trial. After going for over 9 hours of actual "trial time" in this fashion, the Court paused the proceeding and directed the Parties to confer further with the aim of agreeing on matters not really in dispute before the trial would be resumed.

The resumed trial occurred on October 13, 2016, and the Court was gratified to learn that in the interim the Parties had made substantial progress in reaching agreement on numerous evidentiary matters. Much of that agreement is reflected in revised exhibits that were submitted, which Exhibits are identified and attached to a Post-trial Order dated October 17, 2016, Doc. No. 264, as well as in a *Supplemental Joint Stipulation Regarding Admissibility of Documents* ("Stipulation") submitted at Doc. No. 265. In fact, no further evidence beyond these was presented at the resumed trial, which ended up being essentially a final argument by the Parties. The Court also directed the Parties to file post-trial briefs and proposed findings of fact and conclusions of law,

which has been done.  The matter is now ripe for decision.[4]

For reasons to be explained further below, and in light of the original and new evidence presented by the Parties, the Court finds that the entire time period of April 23, 2003 through May 28, 2010 should be considered in calculating liability, that the same methodology previously employed by Judge Markovitz at the original trial must be adhered to here, and, that the end result is a finding that the Tituses are liable to the Trustee in the amount of $273,862.68.

## DISCUSSION

This case involves a mind-numbing array of hundreds of transactions comprising deposits into and expenditures out of the Account over the course of many years, and how all of those various transactions ultimately translate into the amount of fraudulent transfer liability, if any, owed by the Tituses to the Trustee.  When viewed in that fashion, the task presented would indeed be a daunting one.  Fortunately for the Court, however, it is not starting from that point and is not writing on a blank slate.  Instead, the Court is following on the considerable work in the case done previously by Judge Markovitz, as has been reviewed by the District Court and largely affirmed, though remanded for limited purposes pursuant to that court's mandate.

---

[4]   This case involved numerous transactions.  At the urging of the Court, the Parties prepared summary exhibits in lieu of admitting the actual underlying documents for the individual transactions – something that would have overwhelmed the Court.  *See, F.R.E. 1006*.  In the course of doing so, the Court suspects that certain figures may have been rounded to the nearest dollar in some places and stated as an exact figure in others.  Thus, although the Court has tried to be as exact as possible in its calculations, some *de minimis* discrepancies may simply be reasonably unavoidable.

Thus, as this Court sees it, despite the intimidating nature of the relevant transactional facts, the case in its present posture presents three basic issues that must be resolved in order to reach a decision.    The first issue relates to the appropriate time period to be considered in determining liability.  The second relates to the methodology that should be applied to the facts of the case in order to determine liability, and specifically whether the Court is free on this remand to apply a new methodology as proposed by the Trustee, or whether it must follow the methodology previously used by Judge Markovitz.  The third issue involves the application of the chosen methodology, whatever that may turn out to be, over the applicable time period, to the evidence that was presented at the original trial and at the trial on remand, a good part of which is not in dispute.

> **A.**    ***Should the determination of liability in this case extend from the period of April 23, 2003 through May 28, 2010, or are there equitable principles that should limit the period only through April 23, 2007?***

Judge Markovitz limited the Trustee's recovery for fraudulent transfers into the Account to the four-year period preceding the filing of the state court fraudulent transfer complaint, i.e., from April 23, 2003 through April 23, 2007 ("the Look Back Period" or "LBP").  The Trustee had argued that he should also be able to recover for fraudulent transfers during the period after the fraudulent transfer complaint had been filed, up through May 28, 2010[5] ("the Look Forward Period" or "LFP"), or in other words for the entire period from April 23, 2003 through May 28, 2010 ("the Entire Time Period" or "ETP").

---

[5]    May 28, 2010, is the date the order for relief was entered in the Titus bankruptcy.

The Trustee raised this issue on appeal and he was successful.  The District Court held that "[n]othing in the statute or case law suggests that recovery is only permitted for transfers prior to the filing of a fraudulent transfer complaint," and it was therefore error to limit the recovery to the LBP.  *498 B.R. at 515.*  The District Court went on to say, however, that the Trustee may have waived his claims to transfers occurring during the LFP because, while the complaint included a claim for injunctive relief, neither the Trustee nor Trizec ever moved for a preliminary injunction. Counter-balancing this failure to act on the other hand, however, was that the Tituses were aware that post-complaint transfers were at issue, yet they continued to deposit Mr. Titus' wages into the Account.  *Id.*  The District Court found the record on the possible waiver issue to be incomplete and, as was noted above, remanded the case to this Court for a determination of liability for the ETP "unless the [bankruptcy] court finds that equitable principles do not permit transfers after April 23, 2007 to be included."  *Id*. at 525.

Thus, the mandate to this Court is to determine liability for the ETP unless it finds some reason based on equitable principles to limit the period of recovery to the LBP.  The Court finds no such reason.  No evidence was presented at the trial on remand, by either side, that sheds any additional light on the relevant points noted by the District Court, i.e., the Trustee's failure to seek a preliminary injunction and the continued deposit of Mr. Titus' wages into the Account following the filing of the complaint.  For this reason alone the Court would find that the applicable time period for determining liability is the ETP.  The structure of the mandate from the District Court essentially imposed a burden on the Tituses to provide some evidence as to why the Court should deviate from the ETP based on equitable principles, and by failing to provide any such evidence they have not met that burden.

Even if the Court were to overlook the evidentiary burden aspect of this issue as framed in the mandate, it would still find the ETP to be applicable.  The fraudulent transfer complaint filed by Trizec in state court clearly put the Tituses on notice that wage deposits into the Account were at issue, and that this "notice" included not only wage deposits made in the past, but going forward as well.

For instance, the complaint states that Mr. Titus "transacted and continues to transact these transfers," which is an unambiguous statement that transactions going forward would also be included.  *Complaint* at ¶¶17, 18, *see* Adv. Doc. No. 1, Exhibit B.  The complaint also included a request for an injunction against any further transfers into the Account (as recognized by the District Court), again a statement that it was not backward-looking only.  The Court therefore finds that the Tituses knew, or should have known, that the continued deposit of Mr. Titus' wages into the Account following the filing of the complaint was within the scope of the complaint, and that they were therefore at risk of increased liability for doing so.

As against this is only the failure of the Trustee or Trizec to have ever sought a preliminary injunction.  The Court does not find such failure to implicate any equitable principle that would justify limiting the period of recovery to just the LBP.  Nothing in the *Pennsylvania Rules of Civil Procedure* or the *Federal Rules of Bankruptcy Procedure* required the Trustee or Trizec to seek a preliminary injunction merely because the prayer for relief in the complaint included a request for an injunction.  *See, Fed.R.Bankr.P. 7065, Pa.R.Civ.P. 1531. See also, e.g., Mytee Products, Inc. v. Harris Research, Inc.*, 439 Fed. Appx. 882, 888 (Fed. Cir. 2011) (failure to seek a preliminary

injunction would not be considered as a factor weighing against the issuance of a permanent injunction; preliminary and permanent injunctions are distinct forms of equitable relief that have different prerequisites and serve different purposes), *City of Chester v. Chester Redevelopment Authority*, 686 A.2d 30, 35 (Pa. Comm. 1996) (discussing the "separate and distinct" standards for preliminary and permanent injunctions).

The relief provision *under  PaUFTA, 12 Pa. C.S.A. §5107* reinforces the view that the Trustee was not required to seek preliminary injunctive relief with respect to future transfers if he decided instead to seek avoidance of such transfers.    Both avoidance and injunction are among the array of possible remedies that *Section 5107* provides, with  the Comment to the provision stating that the various remedies set forth are cumulative.  *Id. at Comment 6*.   This indicates a recognition that different circumstances may require different remedies when it comes to attacking fraudulent transfers rather than any sort of lockstep approach.  *See,* e.g., *Mid Penn Bank v. Farhat*, 74 A.3d 149 (PA. Super. 2013) (pursuant to Section 5107(a) trial court enjoys the discretion to impose any remedy necessitated by the circumstances).

In the absence of any evidence to the contrary, the Court is also by no means persuaded that the failure of the Trustee to seek a preliminary injunction somehow misled the Tituses and is the only possible explanation as to why they would have continued making the wage deposits into the Account following the filing of the complaint.   Again, no record evidence was presented by the Defendants from which to make such a finding.  Based upon the evidence before the Court, a finding could easily be made to the effect that it made more sense to the Tituses to keep making the deposits into the Account, where they were at least for the time being protected from the

reach of the creditors of Mr. Titus as entireties property, rather than begin making deposits into an

account in Mr. Titus' name, only, which might immediately be vulnerable to a garnishment or other

form of execution.  In other words, the Tituses would be protected by maintaining the status quo.

Thus, the Court finds no equitable reason why the Trustee should be prevented from seeking a

recovery for the ETP.

One final point needs to be addressed before moving on.  While the Tituses did not

provide any evidence of events from prior  to the remand that would support the invocation of any

equitable principle to limit the recovery to the LBP, they do contend that following remand the

Trustee waived the right to any recovery for the LFP.  They argue that this occurred during a pre-

trial conference held on October 7, 2014, when the Trustee supposedly "stipulated" that only the

LBP was at issue on the remand.  *Titus Post-trial Brief* at ¶¶60-61, Doc. No. 275.

There was no pre-trial conference held on October 7, 2014, but there was one on

October 6, 2014, and the Court will assume that is the one the Tituses meant to reference.  The Court

reviewed the audio transcript from that conference and it does not support the Titus' contention.  In

fact, quite to the contrary, the following exchange concerning the applicable time period for the trial

on remand occurred at the pre-trial conference:

Court:          Mr. Vetica, you agree it's April 23, 2003 through
                May 28, 2010?

Mr. Vetica:     I do.

12

*Audio Transcript of Pretrial Conference dated Oct. 6, 2014, 10:15:48.*[6]

The Court thus finds in favor of the Trustee that liability in this case will be determined based on the ETP because no sufficient reason has been provided to limit the period of liability only to the LBP.

> **B.**    ***Is the Court free to adopt a new methodology on remand, or must it apply the one used by Judge Markovitz?***

Having decided that the ETP applies, the next issue concerns the proper scope of this Court's inquiry and ruling following the remand of the case from the District Court.  The Parties express diametrically opposed views on this point.

The Tituses argue that the Court's role should be limited to considering additional evidence as to deposits that were made into the Account and expenditures that were made from that Account for the purpose of incorporating such evidence into and building upon the result previously reached by Judge Markovitz, and to thereby determine the amount of fraudulent transfer liability.  On the other hand, the Trustee argues that the approach followed by Judge Markovitz should be abandoned in favor of a wholly-different methodology, essentially advocating for a complete "do-over" trial on remand.

---

[6]    While not mentioned in the Tituses' Post-trial Brief, at another pretrial conference the Trustee's former attorney did make a statement that "the look forward period is not going to be anything that is in dispute."  *Audio Transcript* of hearing on Feb. 5, 2016, 1:38:56.  This could arguably have meant the Trustee was waiving any claims from the LFP, but could also have been intended as a statement of belief that the Parties would be able to stipulate to all relevant facts for that period.  Given the ambiguity of the statement, as well as the fact that the Trustee subsequently included the LFP in his supplemental pretrial narrative, *see* Doc. No. 220, the Court does not find a waiver.

Before proceeding further, it will be helpful to briefly summarize the methodology

actually used by Judge Markovitz, with particular focus on the deposit side of the ledger,  and

contrast it with the methodology now urged by the Trustee.  Judge Markovitz found, under the rubric

of lack of  "reasonably equivalent value," that:

> ... the direct deposits of the Debtor's salary into the Account may
> constitute constructive fraudulent transfers (a) unless they were spent
> on necessities, or (b) if they were used to purchase other assets which
> are presently held by the Debtor and Mrs. Titus as entireties property,
> regardless of whether such entireties property constitutes a necessity.

467 B.R. at 620.  Expenditures from the Account that went for non-necessities or for other assets

held in a tenancy by the entireties were termed "Objectionable Expenditures" by Judge Markovitz.[7]

He also found that:

> ... in order for the Trustee to prevail on his constructive fraudulent
> transfer actions, he must preponderantly prove, in particular, that the
> direct deposits of the Debtor's wages into the ... Account funded the
> Objectionable Expenditures.  Put differently, the Trustee, in order to
> so prevail, needs to preponderantly prove that no money that was
> deposited into the ... Account during the lookback  period other than
> such indirect wage transfers funded such expenditures.

467 B.R. at 623.

Stated differently, Judge Markovitz put the burden of proof on the Trustee by a

preponderance of the evidence to show that transfers of Mr. Titus' wages into the Account were used

to fund Objectionable Expenditures, rather than place the burden of proof on the Tituses to show the

effective result of such wage transfers.  In so doing, Judge Markovitz effectively made the linkage

---

[7]     For convenience the Court will adopt that same terminology here.

between deposits and expenditures a part of the Trustee's case in chief, rather than an affirmative

defense by the Tituses.  He also recognized, however, that this could put the Trustee at a severe

disadvantage since it was likely that the Tituses would be in the best position to come forward with

evidence concerning deposits and expenditures.  He thus imposed a burden of production on the

Tituses to provide at least "some useful evidence" that the deposits funded Non-Objectionable

Expenditures (i.e., necessities), while leaving the overall burden of proof on the Trustee.  *467 B.R.,

at 613.*  This approach has been vindicated on appeal not only in this case itself, but in others as

well.  *See*, *In re Wettach*, 811 F.3df 99, 105-109 (3d. Cir. 2016), *Cardiello v. Arbogast*, 479 B.R.

661, 666 (W.D.Pa. 2012).

One significant corollary consequence of the burden of proof regime established by

Judge Markovitz has to do with how to treat any deposits made into the Account during the relevant

time period from sources other than Mr. Titus' wages.  For instance, there was evidence presented

at the first trial showing that social security benefits of the Tituses totaling $142,794 had been paid

into the Account.  Judge Markovitz found that, because it was as least as likely as not that the

deposits into the Account represented by these social security benefits were used to fund

Objectionable Expenditures, the Trustee could not meet his burden of proof to the extent of such

deposits.  467 B.R. at 624.

That is not the end of the matter, however, because at the first trial there was also

evidence of still other deposits (in addition to Mr. Titus' wages and social security benefits) that had

been made into the Account, but from sources that Judge Markovitz could not determine based on

the evidence presented.  Based on the unexplained nature of this other group of deposits, Judge

15

Markovitz did not employ the same sort of rationale to effect a setoff for these deposits as he had with respect to the explained social security benefit deposits.

The issue of this differential treatment of explained versus unexplained "other" deposits into the Account was one of the subjects of the appeal to the District Court, which affirmed the approach taken by Judge Markovitz.  In doing so, the District Court quoted with approval from an opinion in one of the companion cases to this one wherein it had been held that to allow unexplained deposits to be used to reduce Objectionable Expenditures would "incentivize [defendants] not to come forward with any information that they had regarding the source of those funds," and "allow them to avoid judgment ... merely by having funds deposited into the account that could not be traced." *Titus v. Shearer*, 498 B.R. at 521 (quoting *Cohen v. Sikirica*, 487 B.R. 615,  625 (W.D. Pa. 2013).  The District Court stated that it agreed with the analysis as stated in *Cohen*, and that on remand the Tituses would have the opportunity to produce evidence about the source of the unknown deposits. *Id*.

This aspect of the District Court opinion is significant for reasons that will be discussed below, and is thus worthy of a closer look.  As was indicated, the District Court cited with approval and appears to have adopted the *Cohen* court's treatment of unexplained deposits, so the Court begins there.

The initial opinion in *Cohen* was issued by the Bankruptcy Court and reported at *In re Cohen*, 2012 WL 5360956 (Bankr. W.D. Pa. October 31, 2012), *aff'd in part, vacated in part, remanded sub nom. Cohen v. Sikirica*, 487 B.R. 615 (W.D. Pa. 2013).  The Debtor in that case was another former T&M partner who, along with his wife, was caught up in the same sort of

16

circumstance as the Tituses based on the deposit of his individual earnings into an entireties account

after Trizec had obtained a judgment against him.  In addition to the Debtor's earnings in *Cohen*,

his wife's earnings and funds from other unknown sources were deposited into the joint account.

The Bankruptcy Court opinion  stated as follows:

> The Trustee also challenges $251,957.59 in deposits into the
> Entireties Account from unknown sources. After removing payments
> made into the Entireties Account that were deposited on account of
> either the Debtor's employment or Mrs. Cohen's employment, the
> Trustee produced a list of deposits from unknown sources. Having
> failed to establish the source of the Entireties Account funds, the
> Trustee argues the Debtor failed to establish the funds were spent on
> reasonable and necessary expenses.
>
> Although the uncertainty of the source of the funds is suspicious, the
> Trustee needed to produce some evidence that the funds deposited
> were payable to the Debtor, or were otherwise under his custody and
> control. Having produced no evidence in that regard, this Court finds
> that the Trustee has failed to meet his burden of proof.[fn. 11]
> Therefore, this Court finds that the Trustee may not recover any
> deposits made into the account from unknown sources.

*In re Cohen*,  2012 WL 5360956, at *13-14 (Bankr. W.D. Pa. Oct. 31, 2012).  The accompanying

Footnote 11stated:

> By way of example, the funds could have emanated from an
> inheritance to Mrs. Cohen only. Such a hypothetical reflects the funds
> could conceivably not have been the Debtor's.

*Id*. at *14.

It thus appears that in *Cohen*, the Bankruptcy Court was focused on whether the

unexplained deposits could be included as part of the "transfer" that formed the basis of the trustee's

fraudulent transfer claim in the case, and not whether they could be used to set off liability as under

17

the O.D. Methodology that Judge Markovitz had used.  Be that as it may, an appeal was taken in the

case and  in that appeal the focus somehow shifted to a consideration of how those same unexplained

deposits would affect liability under the O.D. Methodology.  In the full context of the brief quotes

set forth above, the District Court, acting through Judge Schwab, stated:

> The Court agrees with the reasoning [of Judge Markovitz] in *Titus*,
> that it is as likely as not that the deposits attributable to Ms. Cohen
> were used to fund unexplained expenditures. The Court also agrees
> that the amount recoverable should not be reduced by the amount of
> unexplained deposits that are not attributable to Mr. Cohen's wages.
> If the Court were to reduce the amount recoverable, it would
> incentivize Appellants not to come forward with any information that
> they had regarding the source of those funds. It would allow them to
> avoid judgment in this action merely by having funds deposited into
> the account that could not be traced. Furthermore, the Court agrees
> with the Bankruptcy Court in *Titus* that because sufficient deposits
> attributable to Mr. Cohen's wages exist to fund the unexplained
> expenditures that those transfers were constructively fraudulent.

*Cohen v. Sikirica*, 487 B.R. 615, 625 (W.D. Pa. 2013).

Regardless of how it was that the focus in *Cohen* shifted between the Bankruptcy

Court opinion and the District Court opinion, it was the District Court opinion that Chief Judge

Conti adopted in the present case, and it is that opinion to which this Court must adhere.  The

adoption of  the District Court opinion in *Cohen* on this point essentially creates a bright line rule

to the effect that unexplained deposits may not be used to set off liability under the O.D.

Methodology.  This is apparent because the District Court opinion in *Cohen* does not provide for

any discretion in the matter – it provides there shall be no reduction for unexplained deposits.  The

adverse incentive and judgment avoidance points are raised not as factors to be included in an

exercise of discretion, but rather as reasons for the imposition of a bright line rule.

The net result of the methodology employed by Judge Markovitz, as affirmed on appeal by the District Court, is that deposits into the Account during the relevant time period other than Debtor wages, but only those whose source is sufficiently explained,  will entitle the Defendants to a dollar-for- dollar reduction in what their liability would otherwise be.[8]  The reason for such reduction is that the Trustee cannot preponderantly prove that funds from such other deposits were not used to pay Objectionable Expenditures,  thereby in effect "freeing up" an equal amount of wage deposits to have been available to pay for necessities (i.e., Non-Objectionable Expenditures) from the Account.[9]  For the sake of convenience, the Court will refer to this approach as the O.D.  (for "Other Deposit") Methodology.

The Trustee argues that the O.D. Methodology is fundamentally flawed because it enables a debtor to fraudulently transfer individual wages into an entireties account, while being

---

[8]   Strictly speaking, it may not be completely accurate to say that <u>all</u> sufficiently explained other deposits will result in this reduction in liability.  Although the issue has not arisen in the present case, if a particular, explained other deposit was from a source that was a non-exempt individual asset of Mr. Titus, and assuming it fell within the scope of the fraudulent transfer complaint, such other deposit might itself have been  a fraudulent transfer that  would not  serve as a basis for reducing Objectionable Expenditures under Judge Markovitz' rationale.  The possibility that an unexplained deposit could have come from an individual asset of the Debtor can also be viewed as another reason why *unexplained* deposits are not eligible for setoff treatment (in addition to the potential for adverse incentive and judgment avoidance noted by the District Court).

[9]   Judge Markovitz appeared to leave open at least a theoretical possibility that the Trustee could avoid that result by somehow proving that wage deposits into the Account were used to fund Objectionable Expenditures, but it is unclear as a practical matter how that could  be done.  He also found that the Tituses could not have produced any meaningful information from which the Trustee could have determined whether and to what extent non-wage deposits did or did not fund Objectionable Expenditures.  467 B.R. at 624, n. 13.  Thus, in that respect the burden of production imposed on the Tituses by Judge Markovitz does not have an impact on the calculation of liability under the methodology he used.

protected from exposure to any liability for doing so, so long as the debtor also makes non-wage

deposits into the account in an amount equal to or greater than any Objectionable Expenditures made

from the account.  The Trustee states that instead of applying the O.D. Methodology, the Court

should ignore these other deposits into the Account as irrelevant and find that the Defendants'

liability is established by the amount of the Debtor wage deposits made into the Account, less the

necessity expenditures made from the Account, but only to the extent that the Tituses produce some

evidence to show that the wage deposits actually funded the necessities.  The Trustee argues that this

alternative approach also flows from the fundamental definition recognized by Judge Markovitz, as

noted above, that  direct deposits of an individual debtor's wages into an entireties account may

constitute a fraudulent transfer unless they were spent on necessities, which definition is silent as

to any role for other deposits in the determination of liability.  For the sake of convenience, the

Court will refer to this proposed approach as the O.D.I. (for "Other Deposit Irrelevant")

Methodology.[10]   As an alternative, if the Court is not willing to completely accept the O.D.I.

Methodology, the Trustee suggests that non-wage deposits into the Account should reduce liability

only on  a *pro rata* basis rather than a dollar-for-dollar basis.

        The Court finds that it is not free to simply disregard the O.D. Methodology in favor

of another approach, such as the two alternatives proposed by the Trustee.  It reaches this conclusion

on the basis of two, intertwined principles.  The first is that a party may not litigate on remand

---

[10]        The Trustee refers to the O.D. Methodology as the "non-necessities approach" and
the O.D.I. Methodology as the "total transfer approach".  *See, e.g. Trustee's Post-Trial Brief* at 8-9,
Doc. No. 278.  The Court has chosen not to follow the Trustee's terminology because it seems to
miss the centrality of the role played by "other deposits" in calculating liability as between the two
methodologies.

previously decided issues that it did not raise in the prior appeal, i.e., the "appellate waiver" rule. The second is the "mandate rule," a species of the law of the case, pursuant to which a trial court on remand is to comply strictly with the mandate directed to it by the appellate court.

First, as to appellate waiver, this concept provides that if an issue is not previously raised in an appellant's brief, it is deemed to be waived on appeal. *Wisniewski v. Johns-Manville Corp*., 812 F.2d 81, 88 (3d Cir. 1987). An alternative theory of recovery that was not before an appellate court thus cannot be remanded to the lower court. *Id. See also, e.g., In re Pransky*, 304 B.R. 671, 677 (D.N.J. 2004) (prior determination by bankruptcy court that debtor failed to establish reasonable cause for not filing timely tax return could not be revisited on remand where debtor had not raised issue on appeal); *In re Belice*, 480 B.R. 199, 203 (1st Cir. BAP 2012) (on remand a party may not raise issues that it could and should have litigated on the original appeal).

The problem for the Trustee in the present case is that prior to the case being sent back to this Court on remand, he never raised an issue as to the propriety of offsetting liability by explained non-wage deposits on a dollar-for-dollar basis under the O.D. Methodology. The Trustee's failure to raise such issue goes back even before the appeal to the District Court. As was discussed above, following the issuance of Judge Markovitz's Opinion on February 29, 2012, the Tituses filed the *Motion to Alter*,[11] the gist of which was that, while Judge Markovitz properly reduced the Titus' liability by the $142,974 of social security deposits he found had been made into the Account, he failed to consider record evidence showing that at least another $155,347, and possibly up to $355,522.10, in deposits from sources other than Mr. Titus' wages had also been paid

---

[11]    *See* discussion, *supra*, at page 3.

into the Account during the relevant period and should have resulted in a further reduction to liability.

The issue of the role of "other deposits" into the Account in the methodology for determining the amount of liability was thus brought front and center by the *Motion to Alter*. If the Trustee thought it was improper for Judge Markovitz to have used the O.D. Methodology, it would have been anticipated that he would have made such argument in responding to the *Motion to Alter*, or perhaps even by filing his own post-trial motion attacking the O.D. Methodology. He did neither. The response and brief the Trustee filed regarding the *Motion to Alter* contain no criticism of the O.D. Methodology. *See* Doc. Nos. 71, 83.

The Trustee's failure to raise any issue as to the O.D. Methodology continued during the appeal. In its Memorandum Opinion the District Court noted only two issues raised by the Trustee in his appeal: *first*. whether the Bankruptcy Court erred by not permitting any recovery for the period after April 23, 2007;[12] and *second*, whether the Bankruptcy Court erred by requiring the Trustee to prove that the fraudulently transferred funds were not spent on necessities as part of his *prima facie* case. *See*, 498 B.R. at 514. Thus, the District Court clearly did not perceive that the issue of the O.D. Methodology had been raised by the Trustee in his appeal. In order to be completely certain on this point, the Court also reviewed the briefs filed by the Trustee in the appeal and they confirm that the only two issues raised by the Trustee were those noted by the District Court in its Memorandum Opinion. *See, Shearer v. Titus*, No. 2:12-cv-001560 Doc. Nos. 5 ("... Judge Markovitz committed error on only the two issues as outlined below," p. 7 and 8). Thus, the

---

[12]     The so-called "look forward" period issue, discussed previously.

Trustee did not raise the issue of the O.D. Methodology on the appeal.  Hence, under the Appellate

Waiver Rule he cannot now challenge the use of such methodology on this remand.[13]

That same conclusion is reached if the matter at hand is analyzed as a law of the case

issue or mandate rule question.  Under the law of the case doctrine, when a court decides upon a rule

of law that decision should continue to govern the same issues in subsequent stages of the same case.

*See, In re Klaas*, 548 B.R. 414, 421 (Bankr. W.D. Pa. 2016) (debtors who reached the 60-month

limit in their Ch. 13 Plan but with a slight shortfall in funding at the conclusion of the plan would

be allowed a reasonable amount of additional time to cure the shortfall; "Law of the case" came up

because the creditor that was opposing the debtor had unsuccessfully raised the same issue

previously in the case).  While proceeding under the law of the case doctrine a court may reconsider

its decision, but it should be loathe to do so in the absence of extraordinary circumstances such as

where the initial decision was clearly erroneous and would work a manifest injustice.  *Id.*, citing

*Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800 (1988).  When a court's rulings are

affirmed on appeal, all issues necessarily disposed of in the affirmance become the law of the case

for both the appellate court and the trial court. *Klaas,* citing *Coca-Cola Bottling Co. v. Coca-Cola

Co.*, 988 F.2d 414 (3d Cir. 1993).

---

[13]    Actually, it might be argued that the Trustee's burden of proof issue as raised in the appeal did implicate the use of the O.D. Methodology in a somewhat roundabout way  because if the District Court had found in the Trustee's favor on that point and held that spending for necessities was an affirmative defense on which the Tituses had the burden of proof, and not part of the Trustee's *prima facie* case,  it would have undercut Judge Markovitz's 'equally likely" rationale for allowing other explained, non-wage deposits into the Account to reduce liability. However, since the District Court found against the Trustee on that issue, 498 B.R. at 517,  it is a moot point.

The mandate rule, which is based on the principle of collateral estoppel, is a species of the law of the case doctrine. *Skretvedt v. E.I. DuPont de Nemours*, 372 F.3d 193, 203 n.13 (3d Cir. 2004). As the Third Circuit explained in another case quoted in *Skretvedt*:

> When a court of appeals reverses a judgment and remands for further consideration of a particular issue, leaving other determinations of the trial court intact, the unreversed determinations of the trial court normally continue to work an estoppel ... When the estoppel is operative in proceedings in the same case on remand, courts frequently speak in terms of the law of the mandate or the law of the case rather than collateral estoppel but the underlying principle is the same. *Todd & Co., Inc. v. S.E.C.*, 637 F.2d 154 (3d Cir.1980) (when an appellate court affirms in part and reverses in part, all issues necessarily disposed of in the affirmance become law of the case even though the case is remanded for proceedings on other issues).

*Cowgill v. Raymark Industries, Inc*. 832 F.2d 798, 802 (3d Cir. 1987).

The above is an apt description of what took place in the present case. The District Court affirmed Judge Markovitz as to all of the issues raised on appeal except for: (1) the Trustee's contention regarding his ability to seek damages for the LFP; and, (2) the Titus' contention that the Court made its ruling regarding the burden of production on them too late to afford them an opportunity to introduce relevant evidence. All of the other issues necessarily disposed of in the affirmance therefore became the law of the case / law of the mandate, including the propriety of using the O.D. Methodology.

It can thus be seen that whether the present case is analyzed as an appellate waiver issue, or as law of the case / mandate rule issue, the initial conclusion is that this Court is not free to adopt the new O.D.I. Methodology or the prorata alternative as proposed by the Trustee, but

rather must use the O.D. Methodology just as Judge Markovitz did.  The Court refers to this as an

"initial" conclusion, because, at least under the law of the case / mandate rule doctrine, it is possible

for such initial conclusion to be overcome  if extraordinary circumstances are found to exist that

would justify an exception.  On the other hand, the appellate waiver doctrine does not appear to

admit such an exception.  The question then arises as to what to do when both of these grounds exist

in a case?

That same scenario was present in the *Skretvedt* case where the court found both that

the plaintiff had waived an issue concerning certain ancillary claims that he was seeking to litigate

by failing to include it in a prior appeal, and that the issue fell within the law of the case.  The

*Skretvedt* court found that in these circumstances it could deny a party the ability to litigate the issue

based on the appellate waiver without having to consider the possibility of an exceptional

circumstance exception under the law of the case doctrine:

> In light of Skretvedt's clear waiver of the ancillary claims, we need
> not rely on the mandate rule or law of the case in reaching our
> determination. Skretvedt had a full and fair opportunity to litigate the
> ancillary claims in his prior appeal, and did not do so. Thus we see no
> basis under the facts of this case for applying any of the exceptions
> to the law of the case doctrine. *See In re City of Phila. Litig*., 158
> F.3d 711, 718 (3d Cir.1998) (discussing exceptions to the law of the
> case doctrine).

*Skretvedt*, 372 F.3d at 203, n.13.

Thus, the Court finds that the Trustee's waiver of the O.D. Methodology issue on the

appeal to the District Court precludes the adoption of a new methodology on remand.  Although per

*Skretvedt* the Court  is not relying on the law of the case / mandate rule in reaching this conclusion,

because it would not find the existence of exceptional circumstances to justify an exception to that doctrine in any event, it is appropriate to briefly comment on that theory as well.

The Trustee cites three purportedly exceptional circumstances that would support an exception, but none are persuasive.  First, he says that new evidence has become available because the Tituses were permitted to introduce more evidence as to deposits into and expenditures from the Account.  However, none of this new evidence goes in any way to the propriety of the O.D. Methodology.

It should be recalled that evidence as to the "other deposits" into the Account represented by social security benefits was already part of the first trial and was found to justify a setoff to liability.  Evidence going to the source of yet more deposits into the Account merely enlarges the overall pool of such deposits without in any way changing the principle previously established.  Nor did the Trustee ever object to enlarging the scope of the evidence pool.  In fact he embraced it.[14]

Second, the Trustee argues strenuously that the decision in *In re Wettach*, 811 F.3d 99 (3d Cir. 2016), which was issued after the District Court's Memorandum Opinion, represents a fundamental change in the applicable law that is an "exceptional circumstance" warranting a change in the methodology this Court should apply on remand.  The Court has carefully reviewed *Wettach* and  does not find it to be of such significance so as to justify a deviation from the law of the case for purposes of this remand.

---

[14]     *See* n. 3, *supra*.

While the *Wettach* case does provide some important clarity on issues that are important in the area of fraudulent transfer law involving transfers into entireties accounts (most notably as to burden of proof and burden of production, which results, as previously noted, are consistent with the approach Judge Markovitz took regarding them in this case), it does not directly address the O.D. Methodology because there was no evidence of any "other deposits" being made into the entireties account in the *Wettach* case. That is to say, the only deposits that proved to be at issue in *Wettach* were the wage deposits of the debtor, and no deductions from liability were made due to other deposits into the account.[15] In those circumstances, there was no reason for the appellate court to make a determination as to the O.D. Methodology and as such this Court can see no way that *Wettach* can represent a significant change of relevant law that could qualify as an exceptional circumstance. This Court views *Wettach* in this regard as simply amplifying the process employed by Judge Markovitz in this case, not creating a new approach.

Third, the Trustee argues that the O.D. Methodology should not be followed despite the law of the case doctrine because to do so would be to follow a clearly erroneous approach by

---

[15]    The *Wettach* Third Circuit opinion does make the following comment: "The bankruptcy court even offered [the debtor and his wife] a 'dollar-for-dollar reduction against any liability' for other deposits into the account." *In re Wettach*, 811 F.3d at 111. This comment was in reference to this Court's brief discussion in its *Wettach* opinion of the O.D. Methodology (though that nomenclature was not used there). *See section identified* as "A.(3) Consequences of other Funds going Into an Account," 489 B.R. at 507-08. The Trustee characterizes this innocuous comment by the Third Circuit as "expressing disagreement with [the O.D. Methodology] as a gratuitous benefit to the Tituses." *Trustee Post-Trial Brief* at 12. The Court rejects that characterization as there is nothing in the comment that could reasonably be construed as an expression of disagreement. Furthermore, the Court notes that the last sentence of the same paragraph in which the Third Circuit's comment appears states: "Having failed to carry their burden of production and absent clear error by the bankruptcy court, the Wettachs have no claim for relief on appeal." 811 F.3d at 111. Thus, to the extent the *Wettach* Third Circuit decision can even be viewed as having touched on the O.D. Methodology, it found nothing wrong with such approach.

Judge Markovitz and lead to manifest injustice.   As noted previously, however, the O.D.

Methodology has been used in other related cases (*Oberdick* and *Cohen*), one of which was affirmed

on appeal, not to mention the District Court Memorandum Opinion in the present case which

approved the O.D. Methodology, at least *sub silentio*, with respect to previously-identified social

security deposits.  Were the Court to accept the Trustee's argument it would in effect be finding that

clear error and manifest injustice was allowed to occur in all those other cases, something the Court

is not prepared to do.  One can raise concerns about the O.D. Methodology, as this Court has in the

past, without also concluding that its use is clearly erroneous or manifestly unjust.

To sum up, the Court finds that the Trustee has waived the ability to litigate the use

of the O.D. Methodology on this remand by failing to raise the issue in his appeal, and he has also

failed to set forth any exceptional circumstance that would justify an exception to the law of the case

/ mandate rule which likewise bars reconsideration of the use of that methodology.  For these

reasons the Court finds that it must apply the O.D. Methodology in reaching its decision in this

matter.

Although the Court concludes that it is required to use the O.D. Methodology for the

reasons stated above, it must further find that in the context in which this matter was returned to it

on remand, the Court cannot follow the original approach it intended, which  was to take the

"numbers" as found by Judge Markovitz as a starting point and somehow build from there with the

new evidence presented on remand.  That is also the general approach advocated by the Tituses in

their *Proposed Findings of fact and Conclusions of Law* (hereinafter, "Titus Proposed Findings"),

Doc. No. 274.

At first blush, this "build-on" approach seemed to be an appropriate way to reach a decision on the remand.  However, upon further reflection, and given the sheer quantity of new evidence that was presented by the Parties on the remand, the fact that the applicable period of liability has now been determined to be the ETP – which almost doubles the LBP applied previously – and the Stipulations by the Parties made on remand, that plan  now is less wise, and in fact unworkable.  The present evidentiary landscape bears scant resemblance to what was before Judge Markovitz.   Were the Court to try to force fit the new evidence into the prior numbers that were arrived at by Judge Markovitz without the benefit of a fully-developed evidentiary record, it would be doing a disservice to the Parties and elevating form over substance.  The Court instead believes that a more appropriate course is to faithfully apply the O.D. Methodology, but starting anew based on the current evidentiary record.

C.    *Application  of  the O.D. Methodology with the Additional Evidence Provided by the Parties on Remand.*

The Court may now turn to an actual determination of the Titus' liability, if any, that flows from the application of the O.D. Methodology based on all the evidence that was presented during the trial on remand.

As was indicated above, all of this evidence can seem somewhat overwhelming in that it involves hundreds of individual transactions into and out of the Account.  Fortunately, this task is greatly simplified by a number of Stipulations the parties managed to reach prior to, during, and following the trial on remand.  The Court will go through a step-by-step analysis of activity on

29

the Account during the ETP, beginning with deposits into it, and then turning to expenditures out

of it. Following its analysis of deposits and expenditures, the Court identifies the results and applies

the O.D. Methodology to them to arrive at a decision. All of the above is done in a narrative form

but for the reader's convenience the Court has also prepared an *Appendix* to this Opinion

summarizing the conclusions reached.


### C (i)   *Deposits into the Account during the ETP*

The most fundamental number with which to begin the analysis is $1,125,255.58, i.e.,

the amount of Mr. Titus' individual wages that the Parties agree was deposited into the Account

during the ETP and thereby transformed into entireties property. *See, Stipulation* at ¶14, Doc. No.

265. This represents the overall "transfer" that formed the basis for the fraudulent transfer claim by

the Trustee and he concedes it represents a ceiling – the maximum possible amount that the Trustee

could ever recover in the case. *See, Trustee's Proposed Findings of Fact and Conclusions of Law*

(hereinafter "Trustee's Proposed Findings") at ¶171, Doc. No. 277.

In addition to wages, other non-wage deposits were made into the Account during

the ETP. The Parties have stipulated that non-wage deposits into the Account during the ETP were

$903,165.92. *Stipulation* at ¶9. These non-wage deposits consist of $634,998.83 from explained

sources and $268,167.09 from unexplained sources. *Id.* at ¶14. Total deposits into the Account

during the ETP, both wages of Mr. Titus and all other deposits, were thus $2,028,421.80. *Id.* Also

of potential significance is the Court's finding that the Account already had a balance of $91,272

at the start of the ETP, *Titus Proposed Findings* at ¶6, the bulk of which was from the surrender of

a Northwestern Mutual Life Insurance policy, an explained non-wage source.

### C (ii)   *Expenditures from  Account during the ETP*

The "expenditure side" of the Account ledger during the ETP is more difficult to ascertain than the "deposits side" because, although they have agreed on certain aspects related to expenditures (as discussed further below),  the Parties have not stipulated to a complete picture of what occurred.

Most notably, the Parties have not stipulated to the total amount of expenditures or withdrawals from the Account that occurred during the ETP, which the Court requires for its analysis under the O.D. Methodology.  The Court must therefore make its own finding as to the total expenditures based on the evidence presented.  In that regard, the most helpful  evidence has been the Trustee's Exhibit B.   The Tituses  have  not  provided  any  corresponding  exhibit  as to expenditures.

The Trustee, who bears the burden of proof on the issue, asserted in his post-trial filings that total expenditures from the Account during the ETP were $2,548,196.85.  *See, Trustee's Proposed Findings* at ¶27, basing that figure on his Exhibit B (Rev) which was admitted into evidence following the trial pursuant to the *Post-trial Order of October 17, 2016*, Doc. No. 258. The Tituses have not posited any total expenditure figure by way of a separate exhibit.  The Trustee's proposed figure is problematic for a couple of reasons which need to be addressed.  Before turning to that discussion, however, in order to properly set the stage the Court must first describe Exhibit B in some detail as it is a complex document of over 250 pages that is ostensibly a comprehensive  record of expenditures from the Account during the ETP.

31

Exhibit B, although nominally a single exhibit, actually contains multiple parts. The first part is an overall summary that shows expenditures during the ETP, broken down into broad categories of necessity expenditures, non-necessity expenditures, and "unknown or unexplained" expenditures. *See*, Exhibit B, Bates No. 31.[16]  This overall summary on Exhibit B identified total expenditures from all of these categories as being in the amount of $2,485,239.40.  The second part of Exhibit B appears under "Tab 1," and consists of a categorized summary of expenditures from the Account, Bates No. 33,  followed by numerous pages of charts itemizing each of the individual transactions  from the Account and comprising the totals reflected in that summary, Bates Nos. 34-176.  The Tab 1 summary identified total expenditures from the Account as being $2,134,134.18.

The third part of Exhibit B appears under "Tab 2," and it consists of a categorized summary of expenditures on the Titus' Dollar Bank Visa credit card account, Bates No. 178, followed by pages of charts itemizing each of the individual transactions detailing the entries comprising the totals reflected in that summary, Bates Nos. 179-211.  The Tab 2 summary identifies total expenditures on the Visa credit card account of $144,024.63.

The fourth and final  part of Exhibit B appears under "Tab 3," and it consists of a categorized summary of expenditures on the Titus' American Express  credit card account, Bates No. 213, followed by pages of charts itemizing each of those individual transactions detailing the entries comprising the totals reflected in that summary, Bates Nos. 214-281.  The Tab 3 summary

---

[16]      As is its normal practice, the Court required the Parties to pre-mark all their exhibits with "Bates Numbers" on each page for ease of reference during trial testimony.

identifies total expenditures on the American Express credit card account of $207,080.59.[17]  It can

thus be seen that the total expenditures shown on the Exhibit B overall summary, $2,485,239.40, is

equal to the sum of the expenditures from each of the summaries under Tabs 1, 2, and 3.

Following trial, and to reflect events occurring at the trial, the Trustee submitted

Exhibit B (Rev), which is actually a revised version only of the first part of Exhibit B, that is, the

overall summary.  The only changes between the original version of the overall summary and the

revised version represented by Exhibit B (Rev) is that the expenditures recognized by the Trustee

to have been for necessities was increased from $657,034.29 to $719,991.74,[18] and the total

expenditures were increased by a like amount, from $2,485,239.40 to $2,548,196.85.

Returning now to the original discussion, the Court's first inclination was to accept

the total expenditure figure in Exhibit B (Rev) as an accurate statement of total expenditures from

the Account during the ETP, but two issues calling the accuracy of the figure into question became

apparent.

First, the Court could not understand why the total amount of expenditures as shown

on Exhibit B (Rev) should have changed from the figure on the original overall summary in Exhibit

B based solely on the recategorization of previously known  expenditures from one category (non-

---

[17]     By way of further explanation as to the Visa and American Express accounts, the
Tituses made numerous credit card purchases during the ETP using these two credit cards and then
paid the monthly bills on these cards out of the Account.  One of the important reasons the case was
remanded was to allow them to submit evidence as to the nature of these various credit card
purchases.

[18]     Since Exhibit B (Rev) was filed the Trustee has conceded an additional $3,562.84
of expenditures as having been for necessities, as discussed, *infra*.

necessity or unexplained) to another (necessity).  Second, is a question of whether the Visa and

American Express credit card-related expenditures were "double counted" by the Trustee in arriving

at his proposed total expenditure figure.[19]

The "double counted" issue was first raised by the Tituses at trial when their attorney

argued that $474,564 in credit card expenditures were improperly included twice within the

proposed total expenditure amount.  The Court did not rule on the issue at trial, but after giving it

some consideration post-trial it did have some concern that there may have been  double counting

of  the credit card-related payments that could have overstated the total expenditure amount

proposed by the Trustee.  However, when the Court went to quantify the amount it ran into difficulty

because the $474,564 figure cited at trial by the Tituses, based on the individual line entries for Visa

and American Express payments as set forth in Tab 1 (*see Trial Tr.* at 23-24, 46, August 9, 2016,

and Bates Nos. 125-134) did not match up with the $351,105.22 total entered by the Trustee on the

summaries in Tabs 2 and 3 that supposedly identified credit card expenditures.

The Court could have simply addressed these two issues in reaching its opinion

without receiving further input from the Parties based on such principles as burden of proof,

credibility, etc.  However, attempting to be as fair and accurate as possible, the Court instead opted

to notify the Parties of the issues and offer them a chance to try to clarify matters on the closed

record – somewhat in the nature of a jury that comes back with a question during its deliberations.

---

[19]     The Court is not suggesting any deliberate effort to mislead by the Trustee occurred
with respect to double counting.  The case is a complex one and it is easy to see how there could be
an inadvertent double counting error, particularly where multiple methodologies for calculating
liability have been proposed.

The Court therefore laid the issues out in an order and scheduled argument immediately prior to issuing this Opinion.[20]

The argument scheduled by the Court on these two issues went quickly.  As to the first issue, the Trustee conceded that Exhibit B(Rev) was in error.  The Trustee acknowledged that the exhibit should have indicated the non-necessity figure as having been reduced by $65,034.29 – moving it from $483,086.98 to $418,052.69 – and thus keeping the Trustee's proposed total expenditure figure at $2,485,239.40.

The second issue was a bit more complex.  The Trustee explained that the Visa and American Express credit card payments from the Account derived from the individually itemized payments under Tab 1 represent all such payments made from the Account during the ETP, whereas the Visa and American Express payments as itemized under Tabs 2 and 3 are only the subset of those for which the Tituses produced credit card billing statements.  Hence, the difference between the $474,564 figure under Tab 1 and the figure of $351,105.22 under Tabs 2 and 3.  With that explanation, the Tituses conceded that in making the double-counting argument  at trial they had used the wrong figure.

With the clarifications provided by the Parties at the recent post-trial hearing, the Court can now proceed to make a finding as to total expenditures from the Account during the ETP. As indicated above, the Trustee is now proposing a figure of  $2,485,239.40, but the Tituses now argue that the figure is overstated by $351,105.22 because that amount is double-counted within the

---

[20]    March 21, 2017.

proposed total. Therefore, if the Titus' argument is accepted, the total expenditure figure would be reduced to $2,134,134.18. The Court agrees with the Tituses on this point.

The figures shown on the Trustee's overall summary in Exhibit B preceding the three Tabs, which is what he relies on in support of his proposed finding as to total withdrawals from the Account, does appear to include the $351,105.22 in "identified" Visa and American Express credit card payments twice – once under Tab 1, and then again under Tabs 2 and 3. Indeed, at trial counsel for the Trustee acknowledged as much with respect to the credit card payments shown in Exhibit B that "they're here twice." *Trial Tr.,* August 9, 2016, 28 l. 22. In the Court's view, including the same payments twice as the Trustee has done has the effect of improperly inflating the amount of total expenditures from the Account during the ETP.

Additionally, the Court notes the inherent implausibility of the Trustee's proposed number, which would mean having an account with an initial balance of $91,272 and deposits of $2,028,421.80, as against purported expenditures of $2,485,239.40 during the same period. That state of affairs would result in such account being in a deficit of $365,728 at the end of the ETP. The Court is not aware of any bank that would permit an account to be maintained in such a large deficit, and it concludes that the most likely explanation is that the actual expenditures from the Account were lower than the Trustee contends, and that the Trustee advanced an erroneous number based on a double-counting of credit card expenditures.

When the Trustee's proposed expenditure total is reduced by $351,105.22 to eliminate the suspected double-counting, the total expenditures from the Account during the ETP becomes $2,134,134.18. That figure is much closer to the stipulated deposits into the Account plus

the starting balance, resulting in a much smaller deficit of less than $15,000 that is far more easily

explained.[21]   The Court thus finds that total expenditures from the Account during the ETP were

$2,134,134.18.

Now that a total expenditure amount from the Account has been determined, the

Court must take the further step of dividing the expenditures into those that represent "Objectionable

Expenditures" (again, to continue with the terminology used by Judge Markovitz), because they

were spent on non-necessities or because the Tituses failed to meet their burden of production

leaving the expenditure unexplained, and those that are "Non-Objectionable Expenditures" because

they were for necessities.  The Trustee now concedes that $723,554.58 in expenditures were for

necessities and are thus non-objectionable. *Trustee's Proposed Findings* at ¶32.[22]  Since all other

expenditures would be objectionable, and given the total of $2,134,134.18 in expenditures from the

Account during the ETP, the Court thus starts with a provisional breakdown of $1,410,579.60 in

"Objectionable Expenditures" and $723,554.58 in "Non-Objectionable Expenditures."

---

[21]     Ideally, of course, there would be a  perfect match between deposits plus starting
balance on the one hand and expenditures on the other hand during the ETP.  However, the ETP
starts and stops on dates within months, rather than at the beginning and end of a month as would
normally be encountered in a periodic accounting, which leads the Court to believe that certain
deposits or expenditures may not have been captured, through no one's fault.  An additional
consideration is that the sheer length of the ETP and the large number of transactions involved could
lead to inadvertent errors.  Given these factors, the Court is willing to accept an unexplained deficit
of less than $15,000 in a "universe" of over $2,000,000 as being within a reasonable margin of error,
whereas an unexplained deficit of over $365,000 would be well beyond any such margin.

[22]     In the *Stipulation* filed immediately following the trial on remand, the Parties had
agreed on a figure of $719,991.74 for the total of Non-Objectionable Expenditures, but when he
filed his Proposed Findings a few months later the Trustee conceded an additional $3,562.84 were
Non-Objectionable, resulting in the $723,554.58 figure.

This is a provisional breakdown only at this time because there remains a large group of expenditures within the Objectionable Expenditures category for the moment whose characterization is still disputed by the Parties, and whose proper classification must therefore be determined by the Court. Going into and at the trial, the total amount of these disputed expenditures was $530,623.92. *Trustee's Proposed Findings of Fact* at ¶ 29. Joint Stipulation at ¶¶ 3-6. These have been detailed, as updated through trial to reflect withdrawals of certain expenses from consideration as necessities by the Tituses, and the Trustee's withdrawal of objection to the treatment of certain expenses as necessities, as noted on CR Ex. 3, CR Ex. 4, Ex 16(A) (Rev) and Ex. 16(B) (Rev). Since then, the Trustee's concession that an additional $3,562.84 of the disputed expenditures should be considered necessities, *see* n. 21, *supra*, has lowered the disputed amount to $527,061.08. *Trustee's Proposed Findings* at ¶¶29-31, 33. There is thus $883,518.52 ($1,410,579.60 - $527,061.08) in undisputed Objectionable Expenses.

Unfortunately, there does not seem to be any other way to resolve these disputed expenditures but to go through all of them individually as shown on the referenced Exhibits and make a determination as to which side of the line they fall on. This arduous task can, however, be simplified to some extent by applying the law of the case as appropriate and by grouping like expenditures into broader categories when possible. But before continuing further with the analysis, the Court must comment on how it will make the determination of what constitutes an expense for a necessity, and what does not.

Judge Markovitz found that a necessity for fraudulent transfer purposes is not to be equated with what constitutes a necessary within the "doctrine of necessaries," a judicially-created

doctrine that imposes liability on a spouse for goods provided to the other spouse by third-parties

despite the absence of any express written consent to be so bound.  467 B.R. at 613.[23]   In so doing,

he rejected a contention by the Tituses that an expense constitutes a necessity if, in light of their rank

and position, such expense is necessary to maintain the lifestyle that they enjoyed prior to the

beginning of the LBP.  *Id.* at 614.  Having reached that conclusion, Judge Markovitz went on to

state:

> The Court finds that little guidance really can be offered as to the
> meaning of such term [i.e., necessity]. The Court will certainly apply
> the dictionary definition of the term "necessity."  As well, the Court
> repeats the point, already made earlier herein wherein the Court
> relied upon case authorities regarding § 523(a)(2)(C), that just
> because an expenditure does not constitute a luxury, that does not
> necessarily mean that such expenditure will constitute a necessity;
> put differently, many expenditures will fall between the extremes of
> necessity and luxury and, if such expenditures fall somewhere in
> between such extremes, they will not constitute a necessity. Finally,
> the Court, when endeavoring to ascertain whether an expenditure
> constitutes a necessity, believes that it is inappropriate to consider the
> rank and social position of a judgment debtor and his or her spouse
> – i.e., such decision should not be made by utilizing a sliding scale
> standard predicated on the preexisting lifestyle of such judgment
> debtor and his or her spouse. Instead, factors that are fair game for a
> court to consider when making a determination regarding whether
> something constitutes a necessity would include the number of people
> in such judgment debtor's household, any adverse medical condition
> of a household member, and the cost of living in the general
> geographic area where such debtor resides.

467 B.R. at  615.  The Court realizes this is something of an amorphous standard, but this may just

be the nature of the beast and the best that can be expected.  The Court invited the Parties in the

---

[23]    This finding was not questioned or upset on appeal.

present case to comment in their post-trial filings as to the proper approach for determining what is or is not a necessity, and the responses were not overly helpful.

The Trustee merely suggested that the Court continue to employ the same "conservative" standard it had applied in *Wettach* in deciding whether various sorts of expenses were necessities. *Trustee Post-Trial Brief* at 18. The Tituses stated that the necessity / non-necessity decisions made by Judge Markovitz represent the law of the case and may not be changed here, but did not really offer any proposal for how to determine the status of other types of expenditures that were not faced by Judge Markovitz, beyond merely asserting that they were necessities. *Titus Post-trial Brief* at 14-15.

The Court does agree with the Tituses that, to the extent Judge Markovitz previously made necessity / non-necessity decisions that can be transferred here because they deal with the same type of expenditure, such prior decisions do represent the law of the case and should be followed. However, for new types of expenditures that were not considered by Judge Markovitz, the Court has no choice but to exercise its best judgment as to whether something should be considered a necessity.

There is obviously no bright-line standard available for making such determinations and there will be items on which reasonable minds can differ. Core items of necessity will be expenses to keep the Tituses fed, clothed and sheltered, although even that is not saying much because the Court can see expenses beyond those as necessities, and expenses nominally within them, e.g., a restaurant meal or a hotel stay, as problematic. The overall touchstone is one of reasonableness. The Court also notes that in some instances the Trustee has conceded certain sorts

40

of expenditures were for necessities, or at least that he has no objection to the Titus' characterization in that regard.  Such concessions by the Trustee will be recognized by the Court and extended to their logical end when considering other like or similar expenditures.

A final, brief note needs to be made on how the Court viewed the evidence as to whether individual items were or were not necessities.  Based on the procedure established by Judge Markovitz, the Tituses bore the burden of production as to each item to come forward with at least some useful information on that point.  *See also, Wettach*.  If the Tituses failed as to that burden with respect to a given item, the Court will find it to be a non-necessity.  If the Tituses presented some evidence, then the Court will consider whether that evidence is "useful" in making the required decision as to whether the Defendants have met their burden of production, along with any contrary evidence presented by the Trustee, all the while keeping in mind that the ultimate burden of proof lies with the Trustee.   Where the Trustee offered no contrary evidence either directly or circumstantially once the Defendants meet their burden of production, the Court will find the item to be a necessity.

### C (ii)(a)          *Disputed expenditures governed by prior Judge Markovitz ruling as the law of the case*

As discussed above, Judge Markovitz made some rulings on the necessity / non-necessity question in his Opinion that were not appealed and which would therefore  govern here to the extent applicable as the law of the case.  *Cowgill, supra*.  The Court has identified four categories of expenditures that fall within the law of the case.

41

### C (ii)(a)(1)      *Charitable Expenditures*

Judge Markovitz ruled that, based on *11 U.S.C. §544(b)(2)*, nonpolitical, charitable

expenditures by the Tituses cannot be "avoided" in this action.  *See*, 467 B.R. at 621.  In other

words, the Court understands him to have effectively ruled that nonpolitical, charitable contributions

qualify as necessities for fraudulent transfer purposes.  The Court has gone through the various

Exhibits where the disputed expenditures are listed as well as and the corresponding trial testimony

and it finds the following to have been sufficiently identified as nonpolitical, charitable contributions

such that, consistent with the law of the case as set forth by Judge Markovitz and not upset on

appeal, they will be considered necessities:

| | | | |
|---|---|---|---|
| ● | American Heart Assoc. | $  75 | CR Ex. 3 |
| ● | Pa. Bar Foundation | 50 | "        " |
| ● | Pittsburgh Zoo | 80 | "        " |
| ● | Notre Dame Club of Pitt. | 200 | "        " |
| ● | Phila. Orchestra | 75 | "        " |
| ● | WDUQ | 235 | CR Ex. 4 |
| ● | ACBA Foundation | 130 | "        " |
| ● | NEED | 650 | "        " |
| ● | Carnegie Institute | 130 | "        " |
| ● | WQED | 125 | "        " |
| ● | Simon Wiesenthal Ctr. | 100 | "        " |
| ● | Alex's Lemonade Stand | 50 | "        " |
| ● | United Search Foundation | 75 | "        " |
| ● | CWA/CROP | 25 | "        " |
| ● | CHSC Playground Fund | 100 | "        " |
| ● | American Jewish Comm. | 250 | "        " |
| ● | ACBA Foundation | 25 | "        " |
| ● | Shadyside Boys and Girls | 55 | "        " |
| ● | NLSA | 600 | "        " |
| ● | PA FOP | 196 | "        " |
| ● | 1st Tee | 20 | "        " |
| ● | Saint Charles Lawanga | 200 | "        " |
| ● | UPCI | 100 | "        " |
| ● | Waynesburg Univ. | 250 | "        " |
| ● | Hillel Academy | 100 | "        " |

- Grtr. Pittsburgh BSA          100        " "
- Friars of the Atonement       50         Ex. 16A (Rev)
- Frick Art Historical          360        " "
- Frick Art Historical          180        " "
- Frick Art Historical          100        " "
- First Tee of Pittsburgh       40         " "
- Carnegie Institute            130        " "
- Fed Ex Kinkos (for church)    99.30      " "
- Notre Dame Development        1,500      " "
- Pittsburgh Public Theatre     500        " "
- Pittsburgh Symphony           2,400      " "
- Pittsburgh Symphony           900        " "
- Pittsburgh Symphony           2,400      " "
- St. Bonaventure Univ.         1,000      " "
- TGT target.com (for church)   273.11     " "
- The First Tee of Pitts.            40         "           "
- United Negro College          100        " "
- WQED Multimedia               250        " "
- Boy Scouts of America         100        Ex. 16(B) (Rev)
- PAJC                          400        " "
- Power                         <u>250</u>        " "

TOTAL            $15,068.41


## C (ii)(a)(2)    Attorney Fees


Judge Markovitz also previously ruled on the status of expenditures for attorney fees.

He concluded that reasonable attorney fees that were for legal services specific for the Tituses were

necessities, but that attorney fees paid on behalf of the former partners of T & M were not. *See*, 467

B.R. at note 12.   Based on those rulings, the Court finds that the $50,040 expenditure to Schnader

Harrison (CR Ex. 3), which was for representation of T & M, is not a necessity, but the payment of

$2,500 to Campbell and Levine (CR Ex. 4), which was for the representation of the Tituses, is a

necessity.


43

*C (ii)(a)(3)*    ***Work-Related Expenses***

Another ruling by Judge Markovitz was to the effect that monthly fees paid by Mr. Titus for a parking space near his workplace would be considered to constitute a necessity. 467 B.R. at 622; *see also*, *Trial Tr.*, 114, May 25, 2011, Doc. No. 79. From this, the Court takes as a larger, general principle, and one with which it agrees, that expenses reasonably necessary for Mr. Titus to practice law and thereby earn a living should be considered as being for necessities. Whatever the outer limit of such principle, the Court finds that expenses incurred by Mr. Titus for membership and participation in professional or educational organizations that furthered his legal knowledge and practice, or were for the general benefit of the law, or were for the maintenance of his professional standing as an attorney, can thus be considered necessities (and in some instances might also qualify as charitable contributions as well). A review of the exhibits and trial testimony shows the following expenses to fall within the scope of reasonably work-related expenses:

| | | | |
|---|---|---|---|
| ● | Academy of Trial Lawyers | $ 250 | CR Ex. 3 |
| ● | Am. Inns of Court | 255 | " " |
| ● | A. College of Trial Lawyers | 2,850 | " " |
| ● | Law Club of Pittsburgh | 150 | " " |
| ● | Am. "Sons" [sic] of Court | 265 | CR Ex. 4 |
| ● | Pa. CLE | 19 | " " |
| ● | Allegheny County Bar | 35 | " " |
| ● | American Judicature Society | 1,000 | " " |
| ● | Pa. IOLTA Bd. | 100 | " " |
| ● | American Bar Assoc. | 500 | " " |
| ● | American College Trial Lawyers | 750 | Ex. 16(A)(Rev) |
| ● | American College [of Trial lawyers] | 1,910 | " " |
| ● | Congress Hall | 251.94 | " " |
| ● | Pa. Bar Institute | 119 | " " |
| ● | Trend Micro (home comp. security)[24] | 249.66 | " " |

---

[24]    Mr. Titus testified that this was for a security system on his home computer to prevent it from being hacked. *Id.* at 220-21. He further testified that this was necessary because he did so much work-related activity from home.

- American Judicature Society        <u>564.25</u>        "        "

  TOTAL                              $9,151.04

There is, however, a complicating factor with respect to these work-related expenditures.  On cross-examination   Mr. Titus was asked if he submitted reimbursement requests to his firm for professional affiliations or associations dues and he responded:

> A.     I don't always do that.  Sometimes I do – that's taken
>        as a personal business expense rather than firm.  I
>        haven't always done that.
>
> Q.     But there are some times that you have?
>
> A.     Yes.

*Trial Tr.*, 95, August 9, 2016.  Based on this acknowledgment, were the Court to credit all of the work-related expenditures as necessities it would be an overstatement because he was reimbursed for some of those expenses.  The Court will also note that there was some evidence presented at trial by the Tituses  as to reimbursements received by Mr. Titus from his firm, but it was only for a portion of the relevant time period, and it was not itemized to indicate the reason that reimbursements were being made.  *See*, Ex. 14.

     The Court should also note that under the Judge Markovitz evidentiary regime, as approved on appeal, once the Tituses produced some useful evidence as to the nature of these expenditures, the Trustee was always free to present evidence of his own to rebut the contention that they were for necessities.  The Trustee generally failed to do so, and in particular he offered no contrary probative evidence regarding these business expenses aside from eliciting the admission

that some were reimbursed.  Under the circumstances however, the Court will give the Trustee the

benefit of the doubt since the Court does not feel confident enough in that evidence to use it to

somehow determine which of the work-related expenses identified above were actually reimbursed.

Thus, it cannot be said that in all instances the Tituses provided sufficient useful evidence going to

the question of reimbursement to trigger the Trustee's duty to proceed.  By the same token, the

Trustee has failed to counter in every instance the initial supposition that these are necessary

business-related expenses.  Rather than allow the entire amount as a necessity and overstate, or

disallow the entire amount and understate, the Court will accept 50% of these expenditures, or

$4,575.52, as having been made for necessities.


### C (ii)(a)(4)     *Taxes*


The final such category to consider includes expenditures related to the payment of

taxes.  Judge Markovitz found that fees the Tituses paid for income tax preparation were reasonable

in amount and were a necessity.  He also found that payments identified as having been for "various

taxes" were necessities.  *See*, 467 B.R. at 622.  This approach was not upset on appeal and this

represents the law of the case.  Despite that status, given the large amount at stake in the tax

category of expenditures in the case, the Court will as a check, review the individual payments

falling within this category to see if "necessity" treatment is appropriate.


To begin with, the following record expenditures appear to potentially have been

made for tax payments:

46

| | | | |
|---|---|---|---|
| ● | Treasurer, City of Pittsburgh | $ 73,498 | CR Ex. 4 |
| ● | NY State Tax | 1,472 | " " |
| ● | U.S. Treasury | 243,899 | " " |
| ● | Taxes | 24,482 | " " |
| ● | Pa. Dept. of Revenue | 20,679 | " " |
| ● | John Weinstein | 5,239 | " " |
| ● | Beth Monti, Tax | 1,448 | " " |
| | TOTAL | $370,717 | |

As Judge Markovitz aptly noted, there is little case law on the overall topic of what constitutes a necessity for fraudulent transfer purposes. As far as this Court can determine, other than the Markovitz Opinion itself, there is no such case law on the specific topic of whether taxes are a necessity. There are, however, numerous cases in which the courts have made clear the importance of taxes to the functioning of government and the corresponding duty of individuals to pay their taxes.

For instance, in *U.S. v. Zarra*, 810 F. Supp. 2d 753, 764 (W.D. Pa. 2011) the court held that a "taxpayer has a 'positive obligation to the United States: a duty to pay its tax.'" (quoting *Manning v. Seely Tube & Box Co. of New Jersey*, 338 U.S. 561 (1950)). The *Zarra* court went on to state that "taxes are the lifeblood of government, and their prompt and certain availability an imperious need." 810 F. Supp. 2d at 765 (quoting *Bull v. United States*, 295 U.S. 247 (1935)). Similar sentiments can be found regarding state and local taxes. *See, e.g., Walsh v. School District of Philadelphia*, 343 Pa. 178, 22 A.2d 909, 917 (1941) ("taxes are not penalties, but are contributions which all inhabitants are expected to make (and may be compelled to make) for the support of the manifold activities of government," citation omitted); *In re Broad Street in Sewickley Borough*, 165 Pa. 475, 478 (1895) ("taxes ... proceed upon the theory that the existence of

government is a necessity, that it cannot continue without the means to pay its expenses, that for those means it has the right to compel all citizens and property within its limits to contribute ...," citation omitted).

The Court therefore concludes that, absent some unusual circumstance, the payment of taxes should be considered as an expenditure for a necessity in a fraudulent transfer action such as the present case. The unusual circumstances the Court has in mind are such things as, for example, if the tax is one imposed on property that is itself not a necessity,[25] or if there is evidence to indicate that the tax payment was the product of a deliberate manipulation to somehow gain an advantage for fraudulent transfer purposes. Absent such unusual circumstances, however, payments of taxes should be considered as necessities.

The various tax-related entries as noted above were the subject of trial testimony. Mr. Titus testified that the payments to the "Treasurer, City of Pittsburgh" would have been for city and school district real estate tax, and for city income tax. *Trial Tr.*, 138, August 9, 2016. The real estate tax ($73,498) would have been for the Titus' primary residence located in Pittsburgh, not the vacation camp in McKean County mentioned earlier, *see id.* at lines 16-18, so they were a necessity. The "N.Y. state tax" ($1,472) was a partnership tax imposed by that state because Mr. Titus' firm had an office in that state, so again a necessity. *Id*. at 139.

---

[25]     For instance, Judge Markovitz ruled that insurance paid on a "vacation camp" owned by the Tituses would not be considered a necessity, and likewise property taxes owed on such property would not qualify as necessities.

The next entry for "U.S. Treasury" was testified to be for income tax payments. *Id.* at 140. The vast majority of these expenditures occurred during the LBP, with only $5,672 out of the $243,899 total having been made in the LFP. Mr. Titus credibly testified that the reason for the discrepancy was that as a partner in his firm during the LBP he was responsible for making tax payments himself, but while an employee of the firm during the LFP, he would have had tax withheld from his pay. *Id.* at 143. During trial the Trustee raised several issues concerning these tax payments.

First, he noted that it was typical for the Tituses to be due an income tax refund each year, yet there was nothing to indicate that such refunds showed up as deposits into the Account. However, the tax returns that were submitted as evidence reflected that the practice of the Tituses was to direct the IRS to apply any tax refund that was otherwise due them to their tax obligation for the next year. *See*, Exhibits 3-8. Had they not done so, presumably the refund would have been received and deposited into the Account, but then subsequently paid out in the same amount when the next year's tax obligation came due. In other words, it would have been a "wash situation" and the Court sees no reason to consider this an unusual occurrence that would warrant finding the tax payments actually made were not necessities. Furthermore, having offered this "useful" testimony as to the nature of the expense, the Defendants met their burden of production triggering the Trustee's burden of persuasion. The Trustee offered nothing further regarding this issue requiring the Court to find in favor of the Defendants in regard to it.

The Trustee also raised a question as to the propriety of Mr. Titus including payments made for his personal legal representation in this matter on the "books" of T & M, suggesting that

49

this benefitted Mr. Titus by allowing him to take a deduction he would otherwise not have had available. *Trial Tr.*, 167-171, August 9, 2016. Mr. Titus testified that he was advised this could be done, and the Court does not view its role in this matter as extending to an audit of the Titus' tax filings to make sure they are in strict compliance with the Internal Revenue Code. Furthermore, the Court would note that to the extent the Tituses got a deduction because of the way the legal fees were reported, it would have lowered their tax obligation and thus lowered tax payments out of the Account, which would have redounded to the benefit of the Trustee for present purposes. Without more offered by the Trustee, the payments to the U.S. Treasury for income tax will be recognized as a necessity since the Defendants met their burden of production. As such, the Court finds this expense to be a necessity.

The next item, simply designated as "Taxes" on CR4, was for two transfers totaling $24,482: a check in the amount of $17,500 for "taxes" on January 21, 2004, and a check in the amount of $6,982.50 for "taxes" on February 9, 2004. *See*, Exhibit B, Tab 1 at Bates No. 138. Mr. Titus could shed little additional light on these payments at trial, testifying that he did not know if it was for federal tax or state tax, but only that "obviously I paid taxes." *Trial Tr.*, 141, August 9, 2016. Although this did not add much information, the Court found Mr. Titus to be a credible witness and it does not doubt that the payments were in fact for taxes.

The question then becomes whether enough useful evidence as to these taxes has been provided to require the Trustee to produce evidence showing that the payments were not necessities. The Court finds that enough useful evidence has been provided. It will be recalled that in the Court's view tax payments will generally be treated as necessities unless there is some

indication that they were deliberately manipulated to gain an advantage for fraudulent transfer purposes, or if the taxes were attributable to an asset which is itself not a necessity.  Sufficient information has been provided to allow the Court to rule out either of those possibilities to a reasonable certainty.  Both of the payments in question occurred in early 2004, several years before Trizec had even filed its fraudulent transfer action, so there is no reason to believe any deliberate manipulation was involved.  There is also no reason to think the tax payments were for non-necessity assets.  Given the timing and rounded amount of the $17,500 payment, it seems likely that it was a quarterly estimated federal income tax payment made by the Debtor, who was a partner at Schnader Harrison at the time and responsible for his own tax withholding and payment.  The purpose of the $6,982.50 tax payment is less clear, though there is nothing to indicate that it was a tax payment due to a non-necessity asset.

In deciding the question as to these $24,482 in tax payments, the Court also finds it significant that the Trustee made no effort whatsoever to show that the payments were not necessities, thereby in effect failing to meet his burden of persuasion.  The Trustee did not cross-examine Mr. Titus on the issue and there is no indication that he attempted to depose Mr. Titus during discovery or to serve other discovery requests targeting these payments once put on notice of their existence.  Additionally, based on the Trustee's own Exhibit B, it would appear that the Trustee had the two checks in his possession, otherwise it is hard to explain how he could have prepared the Exhibit, yet he never raised as an issue that such checks did not show a payee.  At the very least, the Defendants met their burden of production triggering the Trustee's burden of persuasion to show that the payments were not necessities.  The Trustee offered no counter evidence in this regard.  As such, for all the reasons noted, these $24,482 in tax payments are found to be for necessities.

The next item was for payments totaling $20,679 to the Pennsylvania Dept. of Revenue which was credibly testified as being for state income tax without any counter evidence offered by the Trustee and therefore will be recognized as a necessity for the reasons stated.  *Id*. at 142.  Next were payments by the Defendants totaling $5,239 to John Weinstein, who was identified as the county treasurer, with the payments having been for county real estate taxes on the Titus residence.  *Id.* at 146.  Following the same reasoning, these payments were ostensibly a necessity to which the Trustee offered no counter evidence and therefore the Court is required to find for the Defendants on this claim.  Finally, payments totaling $1,448 to Beth Monti were identified as being for real estate taxes on the Titus vacation camp in McKean County and will thus not be recognized as a necessity.

To sum up the analysis of tax payments, under both law of the case and based on its own independent review, the Court recognizes that tax payments totaling  $369,269 made during the ETP were necessities, and the remaining balance of $1,448 of tax payments were not necessities.

The foregoing four categories, based on Judge Markovitz's prior rulings as the law of the case, and with which this Court agrees in any event, thus collectively add an additional $391,412.93 to the Non-Objectionable Expenditure, or necessity,  side of the ledger, and remove an equal amount from the Objectionable Expenditure side.  The new provisional amounts pending further analysis are therefore Objectionable Expenditures of $1,019,166.67, and Non-Objectionable Expenditures of $1,114,967.51.

### C (ii)(b)    *Disputed expenditures falling within Trustee concession*

Continuing on, the Court next notes that in the *Trustee's Proposed Findings* at ¶31 he says he is now willing to concede that $1,276.97 in expenditures to Barnes and Noble are necessities.  It appears that the Trustee arrived at that figure by totaling all of the individual Barnes and Noble purchase entries listed on Ex. 16(A)(Rev) (except for three $25 membership renewal fees).  However, there are also similar Barnes and Noble purchase entries on Ex. 16(B)(Rev), and there are entries for what appear to be purchases of books at other businesses as well.   Given the Trustee's concession, and consistent with the approach the Court previously stated it would take in these circumstances, there is no logical reason why these other expenditures should not also be considered as necessities.   After reviewing the relevant material the Court finds the following expenditures fall into this category:

- Other Barnes and Noble    $373.90
- Borders Books    558.74
- Amazon[26]    518.51
- Simply Audio Books    22.46
- St. Bona Bookstore    63.98

  TOTAL    $1,537.59

This moves the new provisional numbers for  Objectionable Expenditures to $1,017,629.08 and Non-Objectionable Expenditures to $1,116,505.10.

---

[26]    Mr. Titus testified at trial that purchases at Amazon would have been for books or small household items and the Trustee indicated he did not object to those being treated as necessities. *Trial Tr.*  80, 195, August 9, 2016.  Ex. 16(A)(Rev), however, still indicates the Trustee is objecting to these purchases being necessities.

*C (ii)(c)*      ***Other Disputed Expenses***

Having now gone through these relatively mechanical adjustments based on prior Judge Markovitz holdings and Trustee concessions, the Court must move on to the remainder of disputed expenditures which will require more difficult decisions.  The sheer volume of the individual expenditures makes it impractical to deal with them on an item-by-item basis.[27]  Instead, the Court will group the expenditures into categories where possible and analyze them that way.

*C (ii)(c)(1)*      ***Hotels***

The first large category of remaining disputed expenditures to which the Court turns is for hotels stays.  These are detailed on Ex. 16(A)(Rev) and 16(B)(Rev), which show entries for stays at Crown Plaza, Holiday Inn, Holiday Inn Express, Hotel Sofitel, NWL Lodging, IHG Hotels, Sheraton Hotel, Hyatt Hotels, Marriot, Springhill Suites, Wyndham Garden Hotel, and Morris Inn. The testimony of Mr. Titus on these stays can generally be summarized as to the effect that almost all of the stays would have been business-related trips, though it is possible that a few were in connection with personal vacation travel.  *See, e.g.*, *Trial Tr.*, 204-05, August 9, 2016.  The Court does not see any need to go into individual detail on these hotel stays because it finds that none of them should be found to constitute necessities.  The Court reaches this conclusion for several reasons.

---

[27]     At the time of trial over 1,000 individual expenses were put before the Court for individual consideration.

First, to the extent any of the stays were for personal vacation travel they were not a necessity.  Second, with respect to business-related stays, the Court will take judicial notice that law firms customarily bill their clients for travel-related expense and attorneys who initially incur such expense out of their own pocket will be reimbursed eventually in some fashion.  Mr. Titus could offer no useful testimony as to these items.  The Court therefore presumes Mr. Titus was reimbursed so that payments he made were not necessities.  Finally, if Mr. Titus in fact did not get reimbursed, either because he chose not to bill his clients for some reason, or because a particular trip was business-related but did not involve a client who could be billed for the expense, then it was incumbent upon the Tituses to provide sufficient evidence to establish such circumstance and they failed to do so.

The provisional breakdown thus remains unchanged after hotel expenses are considered.

### C (ii)(c)(2)      *K-Mart,  Kaufmann's and Macy's Purchases*

The Court is dealing with these expenditures as a group because they are similar in that they were purchases made at stores that carry a wide variety of merchandise.  While the Tituses were able to provide a general sense of what items were bought, they often could not provide individual information as to each transaction.

Ex. 16A (Rev) and 16B (Rev) list numerous expenditures for purchases made at K-Mart.  The total amount of those purchases during the ETP is $8,277.56.  Mrs. Titus testified that these would have been primarily purchases such as cleaning supplies, paint, hardware, toiletries,

household goods and food. *Trial Tr.*, 99-100, August 9, 2016. In the Court's view, this sort of expenditure should be considered a necessity. However, Mrs. Titus also acknowledged that some of the purchases may have been for grandchildren, for example if they needed a gift for a party they were attending, though she could not say with certainty which of those were or how much they were. *Id.* at 114-15. That sort of purchase would not qualify as a necessity.

The Court can certainly appreciate that attempting to categorize individual purchases at a K-Mart years later when there were dozens of transactions involved, most of which likely involved multiple items within a single purchase, is next to impossible. The Court finds that the Tituses have done the best they can in that regard and it concludes they met their burden of production by supplying credit card statements that, unfortunately, do not go into item- by- item detail on purchases.

That still leaves the question of how to account for these transactions. It would be unfair to treat none of the purchases as being for necessities when clearly some were, based on supporting testimony and the very nature of the item. It would be similarly unfair to treat them all as necessities when clearly some were not. From the tenor of Mrs. Titus' uncontroverted "useful" testimony in this regard, which the Court found credible, the non-necessity K-Mart purchases were a fairly small part of the overall purchases. The Court will therefore assume that 35% of the purchases were for non-necessities, which probably overstates the actual amount but which the Court finds to be a fair estimate under the circumstances. The Court thus finds that the Defendants provided at least some useful evidence that 65%, or $5,380 of the K-Mart purchases were for necessities. Again, the Trustee rested solely on the testimony of Mrs. Titus following cross

examination without presenting any controverting competent evidence.  As such, they Court is required to find for the Defendants on this claim to the extent indicated above.[28]

Purchases from Kaufmann's were  made in 26 separate transactions totaling $5,124, and Macy's purchases made in 18 separate transactions totaling $2,558 are also at issue, as identified on CR Ex. 3 and 4.  The testimony as to these purchases was similar to the K-Mart testimony in that they included both goods that could have been necessities by their very nature, such as clothing items for the Tituses, as well as things that would have not been necessities, such as gifts for grandchildren and others.  *See Id.* at 255-56, 258-59.  Mrs. Titus testified credibly that she thought most of the purchases would have been for clothing items for herself, but even so the Court was left with the impression that a larger portion of the Kaufmann's / Macy's purchases were for non-necessities than in the case of the K-Mart purchases.  This testimony was not countered in any credible manner by the Trustee.  The Court thus finds that 50%, or $3,841 of the Kaufmann's / Macy's purchases were for necessities.

The K-Mart and Kaufmann's/Macy's purchases totaling $9,221 found to be necessities thus move the provisional breakdown to Objectionable Expenditures of $1,008,408.08 and Non-Objectionable Expenditures of $1,125,726.10.

---

[28]    When referring to an item as a "necessity" in this Opinion, as previously noted, the test is actually whether the Defendants have produced sufficient, useful evidence of an expenditure being a necessity rather than meeting the ultimate burden of the item actually being a necessity.  That was the standard set by Judge Markovitz in his original opinion which remains applicable on remand as further explained in *Wettach*.  As such, when the finding of a "necessity" is used in this Opinion, without more, it should be interpreted as at least meeting the threshold finding triggering the Trustee's burden to offer counter evidence of non-necessity which was not done by the Trustee.

*C (ii)(c)(3)      Restaurants*

The next large category of expenses to be addressed is for restaurant purchases. Many of these individual restaurant transactions were resolved at trial, either by the Tituses withdrawing them from consideration as alleged necessity expenditures, or by the Trustee stating that he had no objection to them.  The restaurant expenses that remain in dispute are shown on Ex. 16A (Rev) and 16B (Rev).   Based on the testimony at trial, these expenses are generally of three varieties.

One is for restaurants where Mr. Titus would eat meals with colleagues from work or legal clients.  For instance, there are a number of entries for Caffe Amante that he testified is a restaurant near his work place where he would take people to lunch.  *Trial Tr.,* 68, August 9, 2016. The second variety of restaurant expenses were for meals that the Tituses would have together or sometimes with other family members or friends.  *See, e.g.*, the testimony as to Del's Bar, *Id*. at 69. The third category are those in connection with a number of events at Mr. Titus' law firm where mock trials were put on for grade school students and he would pick up the tab for a restaurant to supply food for the students.  *See, e.g., Id.* at 69-70.[29]

---

[29]      There was testimony at trial as to a $999 expenditure at a restaurant named Option House in Bradford that was for a luncheon reception for people who were at the funeral of Mr. Titus' brother.  That does not neatly fit within any of the three categories noted above and may possibly have qualified as a necessity for a funeral expense.  Counsel for the Tituses indicated at trial that this item was being withdrawn from consideration as a necessity, but then stated "we'll keep that one alive."  *Trial Tr.*, 189, August 9, 2016.  The entry does not appear in Ex. 16A (Rev) or 16B (Rev), however, so the Court assumes the Tituses decided to withdraw it after all.

The Court does not see a need to examine individual restaurant transactions in further detail because it does not find any of these varieties of restaurant expenditures to constitute a necessity for purposes of a fraudulent transfer analysis.

With respect to the restaurant expenses for meals consumed by the Tituses themselves, clearly food of itself is a quintessential necessity in that one must have it in order to continue living. However, it is not a necessity that food be obtained in a restaurant. *See, e.g., In re Brumbaugh*, 383 B.R. 907, 913 (Bankr. N.D. Ohio 2007) (in adversary proceeding seeking to hold credit card debt incurred in run-up to bankruptcy filing non-dischargeable, court noted that some of the charges were "for nonessentials such as eating out at restaurants"), *Department of Revenue, Comm. of Ky. v. Your Door Pizza, Inc.*, 670 S.W. 2d 482, 485 (Ct. of Appeals of Ky. 1983) (upholding difference in sales tax treatment between untaxed frozen pizza sold at grocery store and taxed prepared pizza sold at restaurant, and stating "[f]ood is a basic necessity, but restaurant type preparation is not a necessity."), *Minnesota Automatic Merchandising Council v. Smith*, 667 N.W. 2d 159, 163 (Ct. of Appeals of Minn. 2003) ("grocery store food is a necessity; restaurant food is a luxury). The Court recognizes that eating out at restaurants regularly is a common feature of life today and such meals, at least at moderately-priced restaurants, are probably best not characterized as luxuries. However, as Judge Markovitz pointed out, just because something is not a luxury does not mean it is a necessity. Some expenditures fall between necessities and luxuries, and those will not be treated as necessities for purposes of a fraudulent transfer analysis.

As to restaurant expenses which the Tituses paid for the benefit of others, whether clients or colleagues of Mr. Titus, or family or friends or both, there is even less justification for a

finding of necessity.  The payments made to feed students who were attending mock trial events is

admirable, but they cannot be considered a necessity and there was insufficient information

presented for the Court to conclude that they could be considered as a charitable expense.  The Court

thus finds that none of the contested restaurant expenses should be considered necessities, and the

provisional breakdown thus remains unchanged after restaurant  expenses are considered.


### C (ii)(c)(4)      *Remaining Expenditures*


This is as far as the Court can go in dealing with the disputed expenditures in

categories.  Tedious as it may be, the remaining items will have to be individually reviewed under

the standard previously set forth in this Opinion[30]  in order to determine whether they should be

considered "necessities."  To maintain some sense of organization, the Court will begin with the

remaining items on CR Ex. 3 in the order in which they appear, then move to CR. Ex. 4, to Ex. 16A

(Rev), and finally to Ex. 16B (Rev).  The only exception will be when entries for the same payee

appear at multiple  places in the exhibits.  In those instances all of the entries for the same payee will

be dealt with collectively, all at one time, for the sake of convenience.  Given the volume of items

to be considered, the discussion as to each item or grouping of multiple entries  will be kept to a

minimum.


There are four items still undetermined on CR Ex. 3.  The first item is for numerous

purchases at James Floral totaling $7,806 for such things as flowers for funerals, birthdays and

weddings.  *Trial Tr.*, 255, August 9, 2016.  These cannot be considered necessities.  Next is a total

---

[30]        pp. 38-41, *supra* and n. 28*, supra.*

of $155 from Proper's Florist for flowers for the graves of Mr. Titus' parents. *Id*. at 256. Again, these are not necessities. The third remaining item is a payment of $2,473 to the Pittsburgh Symphony. Mr. Titus testified that he and his wife both contribute to and attend the symphony. *Id*. at 134. Based on the testimony given, the unrounded amount of this expense leads the Court to conclude that this expenditure was likely for tickets rather than a contribution, so it will not be considered a necessity. The final remaining item on CR Ex. 3 is $3,155 to Sestilil Nursery for the cost of bushes and planting of same. *Id*. at 257. Mrs. Titus distinguished this from "landscaping" by which she presumably meant such routine tasks as cutting the lawn and raking leaves. While perhaps payment to a third-party for some level of basic outdoor maintenance could be justified as a necessity, particularly as to people unable to do the work themselves for some reason, the material and services provided by Sestilil went beyond that basic level and will not be considered a necessity.

Moving on to CR Ex. 4, the first remaining item there is a $125 payment to Ron Clark, Sheriff. Mr. Titus testified that Ron Clark is the sheriff of Lawrence County and the payment in question was for the service of a complaint in a *pro bono* case that he was handling. *Id.* at 142. The Court cannot consider such an expense a necessity since there was no evidence to indicate that the *pro bono* representation was something that might be charitable in nature. The next item is $63 paid to Miller Frame that was for someone to come to the Titus house to hang paintings. *Id.* at 262-63. That is not a necessity. Next is an unspecified payment amount to "Mary Myamikye," which was identified as a gift for the Titus' newspaper carrier. *Id*. at 265. Not only can a gift not be considered a necessity, the lack of an amount is also disqualifying.

The next two entries on CR Ex. 4 are similar, $175 to CMS Construction and $620 to Rich's Construction. The testimony as to both was that these payments would have been for some sort of work done on the Titus' house, but no further detail was provided. *Id*. at 265-66. Some work done on a house may be a necessity, but not all such work. *See, In re Wettach*, 489 B.R. 496, 517-18 (2013). The lack of sufficient information by the Tituses as to these expenses means they have failed to meet their burden of production, so the Court must find the expenditures were not a necessity.

The last item on CR Ex. 4 is for payments of $2,237 to "Michael Pasadelis." The testimony was that Mr. Pasadelis is a CPA who prepares the tax returns and did the accounting for T&M. Mr. Titus testified that he made the payments in his capacity as the managing partner during the firm's dissolution. *Id.* at 148-49. For the same reason that Judge Markovitz found that legal fees paid by Mr. Titus to the benefit of the T&M partnership were not a necessity for purposes of the present case, the fees paid to Mr. Pasadelis for doing tax returns for that partnership were not a necessity.

Moving on to Ex. 16A (Rev), the first remaining disputed item is to 11633 Greencastle for $46.71. No further explanation for this payment was provided at trial so this is not a necessity. *Id*. at 79-80. The second item is for Aracri's Greentree for $32.60 which was described only as a catalog item. *Id*. at 102. Based on insufficient information the Court finds this to be for a non-necessity. Bed Bath & Beyond is next for $48.13 which was identified as probably a purchase of a tablecloth. *Id.* at 102. This can be considered as an accessory reasonably related to eating meals at home, and as such will be allowed as a necessity. Next are two items from Bits & Pieces totaling

62

$128.91 described only as catalog items.  *Id*. at 102.  These are not allowed as necessities due to insufficient information.  Following those is an entry for BuyComp LLC for $67.15, again described only as catalog items and again disallowed.  *Id*.  Then come three entries for Career Planning for a total of $825.  This was described as being for school testing for the Titus' grandson.  *Id*. at 82.  It is admirable that the Defendants bore this expense for their grandson, but it cannot be considered a necessity.

The next item is to Curtain Call for $54.52.  The testimony was that this was "something to do with ballet."  *Id*. at 105-06.  This is insufficient information to count the item  as a necessity.  Next is an item of $39.94 to Digital River, described only as an order from a catalog.  *Id*. at 106.  This is not a necessity.  The next item is for Hammacher Schlemmer, and there are multiple entries for that (and in one instance Hammacher.com) on Exs. 16A (Rev) and 16(B)(Rev).  In all, there are 6 such entries for $684.35.  The testimony on these purchases was that they were from a catalog, but it was rather vague as to what the products were.  Mr. Titus indicated that they were probably items for the home and Mrs. Titus suggested it may have been for photography gadgets, binoculars, or massage things.  *Id.* at 71, 240-41.  This is insufficient information for the Court to make a determination, so these will be considered non-necessity.

An expenditure of $94.34 at the Little Patriot Shop is the next item and it was described only as something from a catalog that was likely not children's clothing.  *Id*. at 107.  This must be found a non-necessity due to insufficient information.  Next are two entries to Monroeville Mall totaling $180 that Mrs. Titus testified was "just shopping for clothing or something like that."  Again, insufficient information was presented so it will be deemed a non-necessity.  Following that

are 3 entries for OnStar totaling $475.80 which was described as a car telephone that Mr. Titus uses when he is traveling to places such as Erie or Harrisburg. *Id* at 88. This appears to be a duplication of the same service that could just as easily be provided by a cell phone, which Mr. Titus undoubtedly had, therefore insufficient evidence was produced and it will be deemed a non-necessity. Next are two items from Orvis Co. Catalog totaling $144.06, and another three more such entries for $187.60 later in the same exhibit. Mrs. Titus testified that these purchases were likely clothing for Mr. Titus because he wears an extra long sleeve size that this company specialized in. *Id*. at 244. The Court will consider these as necessities.

Next up is a $25.52 payment to Papermart which Mrs. Titus testified was probably for disposable kitchen items such as foil pans. *Id*. at 110. The Court will consider this testimony sufficient to meet the Defendants' burden which was not countered by the Trustee and therefore will be deemed as falling on the "necessity side of the line." There are five Paragon Gift entries totaling $295.66. The only testimony as to these was that they were for catalog things related to the house, *id*. at 110, 244, and as such these are non-necessities. Next are two items for Penn Hills Rental totaling $84.67 which were described as for sharpening garden tools and a lawnmower. *Id* at 110. This will be deemed a necessity related to reasonable household maintenance. Following that are entries for Pottery Barn, four in total here and elsewhere, for a collective $715.05. Mrs. Titus testified that one such purchase, that is $276.06,[31] was for a lamp, another purchase ($369.48) was for a patio umbrella, and did not know what the remaining ones were for. The Court will allow the lamp purchase as a necessity, but disallow the others.

---

[31]    The reference at trial by questioning counsel was to "the $267," but from the context it is clear to the Court that he was referring to the 6/16/2006 entry for $276.06.

A number of purchases from Radio Shack are next on the list, here and elsewhere in the Exhibits, comprising nine individual transactions at a total of $437.09.  Mrs. Titus testified that she only buys batteries and flashlights at the store.  *Id*. at 230.  Resolution of this claim poses some difficulty to the Court because although use of batteries is a fact of life and required in a household to an extent, for usage of those items even over an extended period of time, the number purchased appears high.  Plus, it is unclear what the batteries may have been for and thus whether the testimony could be considered "some useful evidence" of necessities.  As such, the Court will treat 50% of this expenditure which went uncountered by the Trustee, or $218.54,  as a necessity.  The next item is to Robbon Enterprises for $43.35, which was only described as something from a catalog.  *Id.* at 111.  This is insufficient information to make a finding of necessity. The same holds for the subsequent items of Russel's ($24.90), SI Smithsonian ($96.90), and Solutions Solutions ($92.89). *Id*.

The next item on Ex. 16A (Rev), with entries on Ex. 16B (Rev) as well, is to Specialty Luggage.  There are three such transactions totaling $551.44.  Mr Titus testified that this would either be for luggage for himself or his wife, or for a briefcase.  *Id* at 74, 91.  This is a close call.  Mr. Titus was obviously required to travel extensively for his work and such purchases might for that reason be justified as a business necessity even if he also used them for personal travel, but there would be no similar justification for Mrs. Titus.  The Court will therefore treat 50% of these expenditures, or $275.72, as necessities since no counter evidence was offered by the Trustee.

Next are entries for Truffles and Florist totaling $119.94 described only as being for odd catalog items like a vase or serving piece.  *Id*. at 112. Based on that description the Court finds

these were not necessities.  After these comes Vermont Country Store, another catalog.  There are seven entries for this entity (including variants) totaling $796.59.  Mrs. Titus testified that this catalog sells clothing, slippers, gloves, scarves and food, and that the purchases in question were probably for clothing or household items.  *Id*. at 101, 112.  Admittedly the information provided is marginal, and it is not entirely clear which of the items were purchased for the Tituses themselves or for gifts.  Nevertheless, the testimony was credible and based on the overall tenor of the testimony and other evidence the Court believes the Tituses met the threshold requirement of some useful evidence.  As previously done for other group purchases, the Court will recognize 50% of these purchases, or $398.29, as possibly being for necessities.  As such, the Court finds for the Defendants on this claim since the Trustee's responsibility to offer counter evidence was triggered which counter evidence the Trustee did not provide.

Next are three entries for Williams-Sonoma for a total of $128.17, which Mrs. Titus described as being for specialty food items for things she was making.  *Id*. at 112-13, 234, 252.  The Court will allow these as necessities.  The next item is cryptically identified only as "18664715808" on the Exhibit and is for $500.  Mr. Titus testified credibly at trial that the reference is to a phone number for an organization called Pittsburgh History and Landmarks and was for a contribution to it that he made.  *Id*. at 193-94.  The Court finds that this is sufficient information such that this expenditure should be treated as a charitable contribution and therefore as a necessity per Judge Markovitz's prior ruling.  The next item is to 235 Avenue for $15.46.  This was said to be for a catalog purchase that was otherwise not described, *id.* at 235-36, and it will not be allowed.  Next are three entries for B&N Memberships totaling $75.  This was described as being payments made to Barnes and Noble to obtain a better price for books purchased at that store.  *Id.* at 196.  As was

discussed above, the Trustee withdrew his objection to Barnes and Noble expenses as necessities, so it follows that the membership fees should be treated as necessities as well.

Three purchases at Best Buy Co. totaling $1,037.82 are the next items (one entry on Ex. 16A (Rev) and two entries on Ex. 16B (Rev)). Although the Exhibits show these items as being subject to an objection by the Trustee, the Trustee stated at trial that he did not object to them. *Id*. at 225-26. Testimony from Mrs. Titus (*id*. at 237) indicated that one of the purchases was likely a TV set, whose status as a necessity might be debatable, but given the Trustee's statement that he did not object, the Court will consider these expenditures as a necessity. The next items are three entries for Caswell Massey totaling $150.26 that were explained as being for "soaps and sachets" and similar things. While soap in some form can surely be considered a necessity, these purchases strike the Court as likely to have been for luxury versions of the product which will not be recognized as a necessity. *Id*. at 238. The next item is a $935 payment to Chatham University for a summer program for a granddaughter. *Id*. at 198-99. This cannot be considered a necessity.

Up next is an entry for a $695.48 payment to Circuit City which was stated to be for an appliance or TV for the Titus' residence. *Id*. at 199. The Trustee continues to object to this entry, though as indicated above he does not object to a similar expenditure at Best Buy, which is somewhat puzzling. Given the Trustee's objection, and the fact that the information provided is not sufficient for the Court to determine the nature of the appliance / TV in question,[32] the Court must

---

[32]    For instance, a stove or refrigerator might easily qualify as a necessity, while an espresso machine or wine cooler might not. The status of a TV purchase as a necessity might also depend on the type of TV in question and whether it is for use in the primary living space of the house or, say, a guest bedroom.

disallow this purchase as a necessity.  The next entry is for Close to Infinity for $187, described as a catalog item that was probably clothing for Mrs. Titus.  More information would have been helpful, but the Court will accept this as a necessity.  Entries for Consumer Reports, three totaling $78, come next.  The testimony was that these were for magazine subscriptions.  *Id*. at 180-81, 199.  The Trustee previously conceded as necessities newspaper subscriptions and book purchases and the Court likewise finds these to be for a necessity.

An entry for First Street for $67.89 appears next.  The testimony was that this was for a "support deal" for arthritic hands.  *Id*. at 240.  The Court will treat this as a medical device and a necessity.  Following that are two entries for Frick Historical totaling $124.52.  The testimony was that since these were not rounded amounts (such as were a few other entries for the same entity), they would not have been for charitable contributions, but rather for meals at the Frick facility.  *Id*. at 203.  As such, these will not be considered necessities.  Next come two entries for Harris Connect totaling $214.88.  Despite the unrounded figure, Mr. Titus testified that he thought these were for charitable contributions made through Harris Connect, a service which adds a charge on top of the actual contribution.  *Id*. at 204.  Mr. Titus also acknowledged, however, that these could have been for political contributions, which are not necessities, though based on the time of year they were made (May and June) he thought it most likely they were charitable.  *Id*.  The Court finds this to be sufficient information to trigger the Trustee's burden of persuasion and therefore they will be allowed since the Trustee did not counter it.  The next entry is for Hepatica, testified to be a flower shop, and it will be disallowed just as were other flower purchases.  *Id*. at 241.

The next entry is for Jackson and Perkins for $317.22. The testimony was that this was for the purchase of rose bushes for the Titus' residence. *Id*. at 242. This cannot be considered a necessity. Following that is an entry for Legume, Inc. for $88.83. No testimony to explain this was given at trial and it must be disallowed. Next are two entries for "Phipps Consv. and Botan." and Phipps Garden Center for $91.49 and $75.00 respectively. Although the possibility that these were charitable contributions was not entirely ruled out, it appears likely they were not and therefore they will not be recognized as necessities. *Id*. at 210. Following those are two entries simply for "Pittsburgh" totaling $214.32 which could not be explained and will not be allowed. *Id*. at 210-11. Next are two entries for Plow and Hearth, totaling $180.76, described as things for the fireplace. *Id*. at 245. Resolution of this claim is difficult because typically gas fireplaces are mainly for ornamental purposes and items for such a fireplace are hard to justify as a necessity. On the other hand, gas fireplaces are sometimes used as a heat source, and to that extent may be considered as a necessity. Since no counter evidence was offered by the Trustee to the Titus' offer of "some useful evidence" in this regard, the Court will allow 50% of this expenditure, or $90.38, as a necessity.

The next two items shown are for Red Envelope, totaling $340.85. Mrs. Titus testified that these were catalog items purchased for gifts, *id*. at 245, and as such they are not necessities. Next up are two entries for Registry Pittsburgh at a total of $213.74. At one time the Tituses indicated that this item was being withdrawn, *id*. at 89, but subsequently Mrs. Titus was asked about them and indicated these were for wedding gifts, *id.* at 246. Either way these are found not to be necessities. The next entry is to Satellite Radio for $359.64. This was described as being for Sirius Radio for Mr. Titus' car. *Id*. at 216. This cannot be considered a necessity. The following

two entries are for Scout Shop, totaling $215.06.  The testimony was that these were for the support

of the Titus' grandson who was in Boy Scouts, *id*. at 247, but from the context offered these appear

to have been purchases of some undisclosed type and not charitable contributions.  They will not

be allowed as necessities.  An entry for SI Smithsonian Mail Washington for $41.35 appears next,

and the testimony was that this was for an item that Mrs. Titus bought.  *Id*. at 247.  In the absence

of any further explanation as to the item the expense cannot be found a necessity.

An entry for The Avenue for $79.90 is next.  Mrs. Titus testified this was for clothing

from a catalog that she sent for.  *Id*. at 248.  It was not specified that these were clothes for her, but

that was the sense the Court had and this will be recognized as some useful evidence of a necessity

that was not countered thereby requiring a finding in favor of the Defendants.  Next are three entries

totaling $419.94 for The Fireplace.  The testimony was that these were for repairs to the gas

fireplace in the Titus' house which did not work very well.  *Id*. at 188, 232.  No counter, credible

evidence was offered by the Trustee.  For that reason, for the reason previously explained

concerning fireplace expenditures, and also, because anything that uses natural gas should be in

good functioning order as a safety precaution, the Court will treat the expense as a necessity.

Next are three entries for The Linen Source totaling $449.99.  Trial testimony

indicated this expenditure was for bed linens in a hard-to-find size.  These will be allowed as a some

useful evidence of a necessity that was not countered thereby requiring a finding in favor of the

Defendants.  The next entry is for United Airlines for $338.40.  Mrs. Titus testified that this was an

emergency trip she took to Philadelphia after she learned her husband was in the Emergency Room

in a hospital there.  *Id*. at 250.  While other personal travel-related expenses have been treated as

non-necessities, there is sufficient "useful" evidence presented to consider this expense to have been for a necessity especially since the Trustee offered no counter evidence. Following that is an entry for $48.90 to Victorian Trading that was testified to as having been for a stool. *Id*. at 251. The Court cannot determine with this limited information whether this can properly be characterized as a necessary expense, hence it must be disallowed. The final entry on Ex. 16A (Rev) to review is for Victory Goods for $73.85 for "a piece of clothing." *Id*. Again, this is less than ideal information, but based on the "tenor" of the testimony the Court finds it was intended as personal clothing for Mr. or Mrs. Titus and therefore allow it as a necessity since the Trustee offered no counter evidence.

Turning now to Ex. 16B(Rev), the first remaining item for consideration is to B&L Wholesale Supply for $2,739.31. During his testimony on direct examination, Mr. Titus stated that this would have been for lumber and related expenditures made in connection with repairs on the Titus house "which we've had periodically over the years." *Id*. at 66. The problem is that the entry in question was for a single expenditure in that full amount on October 4, 2005, not for a series of expenditures during the ETP. Given the fairly large amount involved, it should have been possible for more specific information to have been provided as to the nature of the repair that was done in connection with this purchase. Nevertheless, the Court finds as "useful" the identification of the purchase since having been for repairs to the residence and therefore the Court will allow this item to be treated as a necessity thereby triggering the Trustee's responsibility to offer counter evidence which did not occur. *See, Wettach*, 489 B.R. at 518 (finding repairs to house to be necessity, as opposed to construction of new amenities).

Next are six entries for a total of $110 for CCP BWA Pittsburgh, which was explained to be a reference to the Central Catholic School Band. *Id.* at 98. Mrs. Titus testified that her grandson was in the band and these were fundraisers for the band. The Court cannot determine from the information presented whether these were straight contributions, which would likely be necessities per the prior ruling, or payments in exchange for products the band was selling to raise money, which the Court would not consider to be for a necessity, at least not without knowing the product. Given the uncertainty these will not be considered necessities.

The next item involves three entries totaling $303.60 for Highlights Catalog. Mrs. Titus explained that these were for subscriptions to the Highlights magazine that she was asked to provide to the Children's Center of Pittsburgh, which was described by her as a childcare center. *Id.* at 99. Based on the information provided the Court cannot tell whether this is a charitable entity, thus these expenses cannot be considered as necessities. Next is an entry of $120.33 to Office Max which Mr. Titus testified would have been either printer ink or paper for his home computer which he used in connection with his work. *Id.* at 73. The Court finds this can be considered a necessity. The next entry is for QP Cellular for $160.50. Mrs Titus testified that was for a portable phone that Mr. Titus gave her that she did not use. *Id.* at 100. With that admission this expenditure cannot be treated as a necessity. Up next is an entry for Scholastic Book Fairs for $30.14 that was only described as "something offered from the schools that you sent for special books for children." *Id.* at 100. This is not enough information to determine whether it might qualify as a charitable contribution so it must be disallowed. Following that is an entry for Wind Weather for $59.69 for a lawn ornament. *Id.* at 101. This cannot be considered a necessity.

Coming to the homestretch, the next entry for consideration by the Court is for $15.12 to Cogo's for gasoline which is a necessity. *Id.* at 180. Following that is an entry for Common App Univ of Notre Dame for $65 which was to pay the application fee of the Titus' grandson to that university. *Id.* This is not a necessity. The next item was for $146.50 to Frontgate Catalog, described only as "something for the house." *Id.* at 228. Due to insufficient information this cannot be considered a necessity. Next are two entries for Territory Ahead, one for "$589" and the other for "($589)," which latter figure the Court would ordinarily take as meaning a credit. This was confirmed by testimony from Mrs. Titus to the effect that this was for a purchase of clothing that was returned for a refund. *Id.* at 233. As such, the two entries are just a wash and will be disregarded.[33] Next is an expenditure of $307.57 to UMP Cokesbury for a gift of ministerial robes to the Titus' son. *Id.* at 190. This cannot be considered a necessity. Following that is a $45 entry for an application fee at the University of Pittsburgh for the Titus' grandson, again not a necessity. *Id.*

That concludes the review of the "remaining expense" items. To summarize, the Court has found that $8,274.57 of these items should be treated as necessities. Updating the provisional breakdown amounts with this result leads to a final breakdown of $1,000,133.51 in Objectionable, or non-necessity expenditures from the Account during the ETP and $1,134,000.67 in Non-Objectionable Expenditures, or necessity expenditures.

---

[33] There is a third entry for Territory Ahead for $594, but Ex. 16B (Rev) indicates that the Trustee does not object to it so it is not addressed here.

### (D)    Calculation of Liability

With the determination of the amounts of deposits and expenditures now having been
completed, the Court can turn to a calculation of liability for the ETP.  The salient points for this
exercise can be summarized as follows:

### Deposits into Account

| | |
|---|---|
| Starting Balance | $    91, 272.00 |
| Mr. Titus Wage Deposits | 1,125,255.58 |
| Other Non-Wage Deposits (explained) | 634,998.83 |
| Other Non-Wage Deposits (unexplained) | 268,167.09 |
| **Total of Deposits and Initial Balance** | **2,119,693.50** |

### Expenditures from Account

| | |
|---|---|
| Objectionable Expenditures | $ 1,000,133.51 |
| Non-Objectionable Expenditures | 1,134,000.67 |
| **Total Expenditures** | **2,134,134.18** |

Using the above figures, applying the OD Methodology is relatively simple and
straightforward.  In the first instance,  the maximum possible recovery of the Trustee has been
reduced to $1,000,133.51, the amount of Objectionable Expenditures.   Second, it must be
determined whether that amount should be reduced further based on any of the Other Deposits into
the Account.

It will be recalled that Judge Markovitz concluded that in the absence of any evidence
to the contrary it was at least as possible as not that "explained" Other Deposits were used to fund
Objectionable Expenditures, thereby reducing the amount of Objectionable Expenditures and

concomitantly reducing the liability of the Tituses on a dollar-for-dollar basis.  The easiest category

of Other Deposits to consider in that regard is the $634,998.83 in explained, non-wage deposits.

Under the O.D. Methodology those clearly serve to reduce Objectionable Expenditures and liability.

When that reduction is taken, the Objectionable Expenditures are lowered to $365,134.68.

Next to be considered is the $268,167.09 in unexplained, non-wage deposits.  This

has proven to be the most difficult item for the Court to deal with.  The Parties agree that these were

not wage deposits,[34] but they also agree that other than being non-wage  the source or sources of

such deposits are unexplained.  Were the Court addressing the treatment of these unexplained

deposits  as a matter of first impression, even given their unexplained status,  it might well decide

that they should nonetheless be considered "other deposits" that reduce the amount of Objectionable

Expenditures under the O.D. Methodology.  There is nothing in the record to indicate that the

Tituses deliberately withheld evidence that could have shown the source of these deposits, or that

these deposits were deliberately made into the Account as a means of shielding the Tituses from

fraudulent transfer liability.[35]  Nor has the Trustee  argued that the deposits came from a source that

was an individual asset of Mr. Titus.  Thus, none of the reasons relied on by the District Court, or

---

[34]    Paragraph 14 of the Stipulation provides in relevant part: "Total *non-wage* deposits
of $903,165.92" and "Total *non-wage* deposits with unexplained sources: $268,167.09." (emphasis
added).

[35]    Although the Parties stipulated that there were $268,167.09 in unexplained deposits
into the Account during the ETP, *see Stipulation* at ¶14, it is not clear that all of the individual
deposits that make up that figure have been itemized in the record.  At least some of them have been
itemized in Exhibits 1(A) Rev and 1(B) Rev, *see* Bates Nos. 555-56, 562-64.  For the most part, the
unexplained deposits shown in these exhibits were for less than $1,000, in unrounded amounts, and
not made according to any apparent timing pattern.  This tends to suggest to the Court that there was
nothing devious going on whereby the Tituses were trying to shield themselves from fraudulent
transfer liability.

75

mentioned by this Court, to deny a setoff for unexplained deposits would seem to apply here.  The

absence of these grounds might be enough to justify "other deposit" treatment.

The Court is not, however, addressing this issue as a matter of first impression.  It

is addressing the issue pursuant to the mandate of the District Court and its duty is to obey that

mandate.  In that regard, and for reasons discussed earlier *(see* pp. 15, et seq., *supra*),  the Court is

of the view that the District Court has established a bright line rule that upon remand  any deposits

that remain unexplained may not be used under the O.D. Methodology to reduce Objectionable

Expenses.  The Court is well satisfied that the Tituses were given a full opportunity on the remand

 to try to explain these deposits.  *See, Trial Tr*, October 13, 2016, 32:18 - 33:16 where the Court

made that specific inquiry.  The Court is also of the view that the mere agreement that the

unexplained deposits were from a non-wage source is not a sufficient explanation to avoid the bright

line rule.  In fact, a review of the opinion by Judge Markovitz and the *Motion to Alter* seem to

indicate that everyone at the time of the first trial were operating under the presumption that the

unexplained deposits then at issue were not wages, so the formal stipulation to that effect as such

does not add anything new.

In short, the Tituses were told by the District Court what they needed to do to get

"credit" for other deposits but, for whatever reason,[36]  they failed to do so with respect to these

---

[36]     Although as indicated previously in n. 35 that most of the unexplained deposits at
issue were in smaller amounts, there were some individual deposits that were of fairly large size.
For example, a $9,066.67 deposit on November 26, 2003 (Bates No. 555), a $17,086.56 deposit on
August 13, 2004 (Bates No. 556), a $32,613.96 deposit on January 31, 2008 (Bates No. 563), and
a $13,552.98 deposit on May 13, 2008 (*id.*)  Frankly, the Court was somewhat surprised that after
the appropriate due diligence the Tituses were unable to at least produce some useful evidence as
to the sources for large deposits such as these given the mandate from the District Court.

$268, 167.09 of deposits.  In being faithful to the mandate, the Court has no option but to deny the Tituses any setoff as to those deposits.

The final component to consider in calculating liability is the $91,272 initial balance that was already in the Account at the start of the ETP.  The Court previously found that such balance existed and that it was derived from the proceeds of a life insurance policy.  Put another way, this initial balance represented explained non-wage funds that were already in the Account at the start of the ETP and were thus as likely to have "funded" expenditures from the Account as the wage deposits, including Objectionable Expenditures, so once again the Trustee did not meet his burden of proof.  Application of that starting balance to the remaining Objectionable Expenditures reduces the liability figure to $273,862.68.  Judgment in favor of the Trustee in that amount will be entered.

## CONCLUSION

For the foregoing reasons, the Court finds that for purposes of determining the liability of the Defendants to the Plaintiff on his Complaint, as directed by the District Court on remand of this matter, the ETP of April 23, 2003 through May 28, 2010, must be considered. Furthermore, the appropriate methodology to be utilized in determining any liability to the Plaintiff as a result of transfers made by the Defendants during this period is the same methodology as used by Judge Bernard Markovitz in his original Opinion in this matter (as referred to herein as the "O.D. Methodology") which was not disturbed on appeal of this matter to the District Court or contrary to the holding in the matter of *In re Wettach*, 811 F.3d 99 (3d Cir. 2016).  Finally, in applying the

above referenced methodology upon consideration of all appropriate credits given to the Defendants,

Paul H. Titus and Bonnie Titus, his wife, as authorized by the District Court on remand and properly

allocated, liability of $273,862.68 is owed by them to the Plaintiff, Robert Shearer.

      An appropriate order of judgment follows.

Dated: March 31, 2017

Thomas P. Agresti, Judge
United States Bankruptcy Court


Case Administrator to serve:
    Neal H. Levin, Esq.
    Douglas Campbell, Esq.
    Kathryn Harrison, Esq.

*(A)* ***Deposits into Account during ETP*** (starting balance $91,272)

| | |
|---|---:|
| Debtor Wages | $1,125,255.58 |
| Non-wage Deposits ($634,998.83 from | 903,165.92 |
| explained sources and $268,167.09 | |
| from unexplained sources) | |
| ***All Deposits*** | ***2,028,421.50*** |

*(B)* ***Expenditures from Account during ETP***

| | |
|---|---:|
| Initial Breakdown | |
| Conceded Necessities | 723,554.58 |
| Conceded Non-necessities | 883,518.52 |
| Disputed by Parties | 527,061.08 |
| ***Total Transactions*** | ***2,134,134.18*** |

| | |
|---|---:|
| Findings as to Disputed Expenditures: | |
| Addl. Necessities / Law of case | 391,412.93 |
| $    4,575.52 - work related exp. | |
| 2,500.00 - professional fees | |
| 15,068.41 - charitable donations | |
| 369,269.00 - taxes | |
| Tr. concession | 1,537.59 |
| Department Store Purchases | 9,221.00 |
| Remaining" Expenditures | 8,274.57 |
| ***Total Addl. Necessities*** | ***410,446.09*** |

*(C)* ***Final Breakdown***

| | |
|---|---:|
| **Non-Objectionable** (necessities) | **1,134,000.67** |
| **Objectionable** (non-necessities) | **1,000,133.51** |
| **All Expenditures**   (Trustee's proposed total expenditures | ***2,134,134.18*** |
| of $2,485,239.40, less $351,105.22 to eliminate | |
| double counting of credit card payments) | |

*(D)* ***Calculation of Liability using O.D. Methodology***

| | |
|---|---:|
| Maximum Theoretical Liability based on Amount | 1,125,255.58 |
| of Wage Transfer into Account | |
| Actual Maximum Liability based on Objectionable | 1,000,133.51 |
| Expenditures from Account | |
| *Less:*   Explained Other Non-wage Deposits | 634,998.83 |
| Starting Balance from explained non-wage source | 91,272.00 |
| ***Total    Liability*** | ***273,862.68*** |

# APPENDIX